Moffet vs. Koch.

---

No. 13,682.

WILLIAM S. MOFFET vs. JULIUS KOCH.

SYLLABUS.

ON MOTION TO DISMISS APPEAL.

Act 41 of 1894, authorizing certain corporations to become sureties on bonds, is an amendment of the Code of Practice by implication, so far as it declares and defines the qualification of personal sureties.

ON THE MERITS.

1. In determining whether the relations between parties are those of contractee and contractor, or employer and employe, "the simple test is, who has the

Moffet vs. Koch.

general control over the work; who has the right to direct what shall be done, and how to do it? And, if the person employed reserves this power to himself, his relation to his employer is independent, and he is a contractor; but, if it is reserved to the employer, or his agents, the relation is that of master and servant."

2. Where an employe is not placed by the employer in a position of undisclosed danger, but is a mature man, doing the ordinary work which he was engaged to do, and whose risks are obvious to any one, he assumes the risks of the employment, and no negligence can be imputed to the employer for an accident to him therefrom.

### ON REHEARING.

A separate appeal, taken by the plaintiff, after a final judgment on the merits in his favor, from an interlocutory ruling dismissing a supplemental petition which had been filed by him during the proceedings in the district court, injects into the case brought up by the appeal, previously taken on behalf of defendant, from such final judgment, no issues other than those presented in the transcript filed by the defendant. If the appeal so taken on behalf of the plaintiff is entitled to any consideration it must be as a separate matter and should have been so docketed.

APPEAL from the Civil District Court, Parish of Orleans.—*St. Paul, J.*

*Benjamin Rice Forman* and *William J. Hennessey,* for Plaintiff, Appellee.

*Denegre, Blair & Denegre,* for Defendant, Appellant.

The opinion of the court, on motion to dismiss, was delivered by WATKINS, J.

The opinion of the court, on the merits, was delivered by MONROE, J.

On the application for a rehearing by MONROE, J.

### ON MOTION TO DISMISS APPEAL.

The opinion of the court was delivered by

WATKINS, J. Plaintiff and appellee bring to the attention of the court the fact, that he filed in the District Court a motion to dismiss the defendant's appeal, on the ground that the surety on the appeal bond "was not a legal surety, because it did not possess property situated within the State," and that said motion was, on trial, dismissed;

and that upon a supplemental transcript which contains the evidence, he now renews his motion to dismiss.

The argument, on the part of the defendant's counsel, presents the question at issue very succinctly; and we have made the following extract therefrom, viz:

"This rule was tried on admissions, the plaintiff in rule admitting that the surety company which signed the bond had fully complied with Act No. 41 of 1894, and the defendant in rule admitting that the surety company had no property within the jurisdiction of the court."

The act of 1894 does not require surety companies to have property within the jurisdiction of the court in which the bond is furnished, nor, for that matter, within the State. The first section of the act defines the kind of corporations which may become surety; states the capital and assets which it must have; and provides that "such execution, by such company of such bond, undertaking or obligation, shall in all respects be a full and complete compliance with all the requirements of such laws, ordinances, or regulations that such bond, undertaking or obligation, shall be exercised by one or more sureties, or that such sureties shall be residents, or freeholders, or either or both, or possess any other qualification," contains other language showing that the act does not require that the corporation shall have property within the jurisdiction of the court, or within the State, and provides that certain duties shall be performed by the Secretary of State, in order to insure the solvency of the companies acting as sureties.

The act of 1894 has been in force for six years, and appears to have been accepted and approved of by the profession, since it has been attacked in but two cases, both of which have been decided in our favor, namely the Standard Cotton Seed Oil Company vs. Matheson, 48th Ann. 1321, and Holmes vs. Railroad Company, 49 Ann. 1466.

In the Matheson case, the court used the language quoted in the appellee's brief, but nevertheless maintained the validity of the surety, notwithstanding the fact that the objection that surety companies were not required to have property within the State, was pressed home; for on page 1324 it appears that counsel in that case argued "nor can private citizens be admitted to suretyship on legal bonds, unless they have property within the State."

The motion to dismiss in Holmes vs. Railroad Company, 49 Ann., seems to have been suggested by the language quoted from the Matheson case, for the point was made in this case "that the surety is not

a resident of the Parish of Orleans, where it has no "property," but, nevertheless, the motion to dismiss was denied.

It seems to us that, boiled down, the point made by the appellee is that the act of 1894 is in conflict with an article of the Code of Practice, which requires that the surety shall reside within the jurisdiction of the court, and an article of the Civil Code, which provides that the surety shall have property liable to. seizure within the State. If there be a conflict, the act of 1894 governs, being the later act, and repealing *pro tanto* the articles of the Code and the Code of Practice, as decided in the Matheson case, 48 Ann. p. 1323.

We know of no provision in the Constitution which prevents the Legislature from making any regulations it sees fit with reference to sureties, or which requires the Legislature to exact any surety at all in the case of an appeal, and, as a matter of fact, Article 3042 of the Civil Code, until amended by Act No. 76 of 1876, did not require that the surety should have property within the State.

The Statute of 1894 was enacted for the special purpose of authorizing certain corporations to become sureties on bonds, and it prescribes the conditions under which they may do so. One of its requirements is that such corporation shall have a *cash* capital of not less than $250,000, and has qualified under the provisions of this act "and which has assets allowable as such under the laws of this State, or under the laws of the State in which it is incorporated in excess of its capital stock, outstanding debts and a premium reserve on all outstanding risks," etc. Sec. 1, Act 41 of 1894.

The company having complied with these conditions "it shall become subject to all the liabilities, and have all the rights of sureties under the provisions of the law relating thereto; it being the true intent and meaning of this act to enable corporations created for the above purposes to become and be accepted as *sole surety* on all bonds," etc. *Ibid.* (Italics ours.)

The motion does not disavow the fact that the guaranty company had in this case qualified itself according.to.that statute, and hence that fact may be assumed.

That statute must be accepted and considered as an amendment to that provision of the Code of Practice relied upon by the appellee.

We are of opinion that the district judge disposed of the motion correctly.

Motion to dismiss denied.

## ON THE MERITS.

MONROE, J.   This is a suit for the recovery of damages sustained by the plaintiff, whilst engaged in assisting in the erection of a brewery, for the building of which the defendant was the contractor.   The plaintiff alleges that he is a carpenter; that he was employed in that capacity by John Weiss, the agent and representative of the defendant; and that, whilst engaged in the work for which he was employed, under the direction of both of said parties, he received the injury of which he complains by reason of their negligence and of the fact that they subjected him to danger of which he was ignorant and of which they failed to warn him.

The defendant denies that Weiss was his agent, and avers that he was an independent contractor; and he further denies the negligence imputed to him, and alleges that the plaintiff, when injured, was engaged in the work for which he was employed, and the risks of which he had assumed.   There was a mistrial, originally, by reason of the sudden illness of a juror.   Upon the second tral there was a verdict for the plaintiff, which was set aside by the judge *a quo*.   Upon the third trial there was another verdict for the plaintiff, and the defendant has appealed.

The evidence shows that the defendant had contracted to erect the brewery, and that he let out to John Weiss the contract for general work, including the hoisting into position of the iron required in the building; that Weiss employed and discharged his own mechanics and laborers; and that the defendant communicated with him, and not with the men employed by him.   Nevertheless, there is, upon the one hand, an uncertainty as to the precise limitations of this contract, and, upon the other, a certainty that the defendant was continually on hand, and in control, even though his directions as to how the work should be done were given to Weiss, that leads us to conclude that the latter was not an independent contractor to the extent of relieving the defendant of liability for his conduct in the prosecution of that work.

"The simple test is," says Mr. Wood, "who has the general control over the work?   Who has the right to direct what should be done and how to do it?   And if the person employed reserves this power to himself, his relation to his employer is independent, and he is a contractor, but if it is reserved to the employer, or his agents, the relation is that of master and servant.   Wood on Master and Servant, 614 (cited in Tutrix vs. Sellers & Co., 32 Ann. 1017.)

Upon the merits; the evidence shows that the plaintiff had been working at his trade for about twenty years; that for four or five years before the date of the accident out of which this suit has arisen, he has been frequently employed as foreman; that he was so employed when the accident occurred; and, in the absence of his employer, John Weiss, during certain hours of the day, was left in general charge of the work, and, with another foreman who had supervision of the laborers, was vested with authority over the workmen, numbering, sometimes, as many as thirty-five. It is further shown that the defendant's contract called for the construction of a building to be used as a boiler-room, the roof of which was to be supported by steel trusses; that the work of hoisting into position and securing the trusses was included in the sub-contract taken by Weiss, and that the plaintiff, as Weiss' foreman, superintended and assisted in that particular job, and in placing and making fast the purlins which, whilst forming part of the roof, served also as braces for the trusses on which they rested. Defendant's contract also called for the erection of an engine-room, being a building twenty-nine feet wide by thirty-nine feet long, with walls about thirty feet high, the roof of which was to be supported in a manner similar to that of the boiler-room, that is to say, upon two steel trusses long enough to extend from wall to wall, across the building, and placed, as we understand it, about equidistant from the ends of the building and from each other. These trusses, as actually constructed, are steel frames, say, thirty feet long and about six feet high; and, when in position, with the ends resting upon the walls upon either side of the building, have, each, the appearance of an open fence, or the skeleton floor of a bridge, set on edge; and it will be readily understood that whilst merely resting on the walls, and until braced in some way, are very liable to fall to one side or the other. Upon December 28th, the plaintiff, according to the allegations of his petition, assisted in hoisting one of these trusses into position, and in bracing it, slightly, where the ends rested upon the walls. Within the next few days, a number of purlins, being rather heavy pieces of wood, intended to extend from truss to truss, and from the trusses to the walls at each end of the building, were hoisted up and placed, at random, across the trusses. And, early in the morning of December 30th, Weiss, who probably had other contracts on his hands, and was in the habit of absenting himself from this particular building for a number of hours each day, leaving the plaintiff in charge, gave the

Moffet vs. Koch.

latter certain general instructions, which, together with some other matters of interest, will be best understood from the following excerpt from his testimony, to-wit:

"Q. Who was next in authority under you? A. William Moffett. Q. Did you have any conversation with Moffett with reference to these trusses and the work to be done on them? A. Early in the morning, I did. Q. What was the nature of this conversation early in the morning? A. I told him to divide some of his men off of the boiler-room roof and to continue with the engine-room. Q. And after you had that conversation with him, did you remain there or go away? A. I left the works. Q. When did you come back to the works? A. About 2 o'clock. Q. When you got back to the works, what directions, if any, did you give to Moffett? A. None. Q. Where did you go when you came back? A. I walked up on the roof, through the trusses, and crossed the one and got over on the fire-wall. Q. Where was Moffett when you climbed up? A. On the boiler-room roof. Q. What did he do after he saw you? A. He started for the engine-room roof. Q. Do you know if anything was said to him? A. Yes, sir; only a remark by Mr. Schroeder. Q. Do you remember what that remark was? A. Yes; he said these trusses were dangerous. Q. Was anything said by Mr. Moffett? A. He said, "Yes," but I had my back turned from him. I turned away and I said: "Billy if that is the case, you will get a line on it." He said: "Look out, there they come." Q. Whose duty was it to put the purlins into position? A. Mr. Moffett's. Q. Who placed the purlins in position on the roof of the boiler-room? A. Mr. Moffett."

Schroeder was a workman whom Moffett had ordered to assist him in spreading, i. e., placing in their proper positions the purlins, which were then lying in disorder across the trusses. He testifies that he saw that the trusses, which had either not been set perpendicular when hoisted up, or else had been disturbed by the placing on them of the purlins, were in a dangerous condition and that he called the attention of Moffett to it. Poree, the contractor for the brick work, testifies that he saw the danger and called to Denny, the foreman of the laborers, who told him to speak to Moffett, and that he then called to Moffett that the whole thing would come down. And Denny testifies that Poree spoke to him on the subject, and that he told him to go to Moffett. Whatever, therefore, may be the value of the plaintiff's denial, that he was warned of the dangerous condition of the trusses, the

fact remains that the danger was obvious to other persons who did not share his responsibility in the matter; and, whilst the evidence referred to and other evidence relating to statements made by the plaintiff after the accident, strongly indicate that he was aware of the danger of his undertaking (as he went about it), we find no reasonable explanation or excuse for his ignorance of that danger, if ignorant he was. It was his business and his duty to have known it. And considering that he had been a carpenter and house framer and builder for nearly twenty years, and had frequently acted as foreman on such work, and had accepted and was occupying the position of foreman on the work in question; and that he had been in charge of similar work, under the same contract, his employer was justified in assuming that such work was not beyond his intelligence or capacity. It was work that had to be done by somebody, and if Weiss had not believed that the plaintiff was capable of doing it properly, he would, doubtless, have done it himself, or have employed another man. But we learn from the record that the plaintiff was regarded as a competent man for his position, and there was no reason to suppose that he would be unable to do work which properly belonged to that position, and the risks of which he had assumed in accepting and in holding such position. In this connection, it may be remarked that there was a derrick in the building, with guy ropes attached, and it is admitted by the plaintiff, and shown beyond controversy, by other witnesses, that, by the use of those appliances, he might have secured the trusses, in a few minutes, and have made them perfectly safe. He took no such precaution, however, but went on to the truss, which he had assisted in putting up, as it was, with the result, that it tilted over and fell to the ground, bringing with it the other truss and the purlins which were on them, and bringing also Schroeder, who had followed the plaintiff, and the plaintiff himself. And the plaintiff's right hand was so badly crushed by some of the falling material that it had to be amputated. We are unable, upon the facts as presented, to reach the conclusion that the defendant is in any way responsible for this deplorable result. No one knew better than the plaintiff how the truss upon which he ventured had been, temporarily, braced when first hoisted into position, for he had assisted in bracing it. No one knew better than he how to go about bracing it, permanently, for he had braced permanently, the trusses on the boiler-room roof, and, by using the appliances which were at hand, he could have braced the trusses in question, in the same way, and without danger to

himself or his fellow workmen. In a case involving the same principle of law this court has said:

"The deceased entered the employment of the defendant company as a flagman and switchman with a full knowledge of the character of the service required of him, and the dangers incident to the employment. He assumed all those risks when he entered into the service of the defendant company. The defendant company did not increase the risk assumed by the deceased and to which he subjected himself. There was no defect in any of the appliances provided by the defendant company for the performance of the duties required of him, and there was, therefore, no negligence." (Citing authorities.)

Dandie vs. Railroad Co., 42 Ann. 689.

And, upon the same subject, the Supreme Court of the United States has said:

"Where an employee is not placed by an employer in a position of undisclosed danger, but is a mature man, doing the ordinary work which he was engaged to do, and whose risks are obvious to anyone, he assumes the risks of the employment, and no negligence can be imputed to an employer for an accident to him therefrom." Kohn vs. McNulta, 147 U. S. 238.

The rule, as thus stated, is applicable to the case at bar, and precludes recovery by the plaintiff.

It is therefore ordered, adjudged and decreed, that the verdict and judgment appealed from be annulled, avoided and reversed, and that the plaintiff's demand be rejected, at his cost in both courts.

## ON APPLICATION FOR REHEARING.

MONROE, J. Counsel for plaintiff calls attention to the fact that the opinion handed down fails to notice the ruling of the trial judge dismissing a supplemental petition, whereby, after issue had been joined, and after there had been a mistrial, the plaintiff sought to bring into the case an additional defendant. It appears that the supplemental petition in question was dismissed, in January, 1900, upon an exception filed on behalf of the original defendant; that the case was thereafter tried, with the result that, in June, 1900, there was a verdict and judgment for plaintiff, from which said original defendant appealed; that, in November, following, after a complete transcript of all the proceedings in the case, up to, and inclusive of, the appeal thus taken, had been lodged in this court, the plaintiff obtained an order of appeal

from the interlocutory ruling whereby his supplemental petition had been dismissed, and that he undertook to perfect the appeal so taken by filing in this court a transcript of the proceedings which took place in the District Court after the appeal had been taken by the defendant, and by obtaining, upon *ex parte* application, permission, which was granted without notice or prejudice, to make use of the transcript which had previously been lodged here by the defendant.

It seems clear that the appeal thus taken by the plaintiff, whatever may have been its merits, did not have the effect of injecting into the case as brought up by the defendant's appeal any other questions than those presented in the transcript which the defendant had filed. And, as that transcript discloses no complaint concerning, or appeal from, the interlocutory ruling dismissing the plaintiff's supplemental petition, and as there is no answer to the appeal taken by the defendant, it follows that the question of the correctness of that ruling was not presented for review in the case which has been decided. If the appeal as taken on behalf of the plaintiff is entitled to any consideration, it must be as a separate matter, and it should have been so docketed.

We find no reason, upon this, or other ground, for granting a rehearing, and the same is accordingly refused.