## No. 14,015.

## FRANK GOOTHYE vs. LOUIS DELATOUR.

### SYLLABUS.

Where the preponderance of evidence in a case depending on facts is in favor of the plaintiff, and there is nothing in the record affecting the credibility of his witnesses, the Supreme Court would act arbitrarily should it disturb the verdict of a jury and a judgment in his favor.

A PPEAL from the Civil District Court, Parish of Orleans— *St. Paul, J.*

---

The plaintiff seeks a judgment against defendant for twenty-five thousand dollars as damages on the ground that—

On the 21st of August, 1900, defendant wilfully entered plaintiff's private premises and assaulted him with a pistol, then and there shooting at him with a loaded pistol, when a ball from said pistol, shot by defendant, entered petitioner's body through the left side of his breast, penetrated his left lung near his heart thereby causing aneurismal varis of the heart, a permanent and painful injury endangering his life.

That ever since said shot he has suffered great pain and was, and is, and ever will be, prevented from transacting his ordinary business;

Goothye vs. DeLatour.

he has also incurred expenses for physicians and medicines endeavoring to be cured of the wound.

That he was laid up and was still laid up invalided and unable to walk, and enduring constant physical and mental suffering; that his strength was undermined and he was no longer able to work or earn a living in consequence of said wound and its immediate consequence. That petitioner was without fault, and contributed in no way to the said injuries; that the wound was inflicted upon him by defendant wilfully and without provocation.

The defendant, after pleading the general issue, averred that all his acts in the premises were done to protect his own life and to save himself from serious bodily harm at the hands of plaintiff and his half brother, Rudolph Eishman.

That if he fired and discharged any pistol and wounded plaintiff, it was after he had been assaulted by plaintiff, who was aided and assisted by his said half brother; that they, acting together, assaulted him, both with their fists and a hoe, inflicting wounds of a serious and dangerous character upon his forehead and over his eye. That said wounds so inflicted were without cause or provocation, and plaintiff acted wilfully and maliciously and without any cause in assaulting him, and his acts and those of his half brother, Rudolph Eishman, they acting together at the time, were malicious, wanton and without any reasonable excuse therefor. That after he was assaulted, if he used a pistol, it was done to protect his life and to protect himself from serious bodily harm at the hands of plaintiff and his half brother.

Assuming the character of plaintiff in reconvention, he charged that plaintiff was indebted to him in a sum of money amounting to about twenty-four or five dollars, twenty dollars thereof being on a note which was then due and an open account that on the 21st of August, 1900, he for the purpose of obtaining a settlement and liquidation of the plaintiff to him went to the place where he resided; that before reaching the house, and in an open field or square, he met the plaintiff and his half brother; that without any cause, reason or excuse and without any justification they then and there, acting together, wilfully and maliciously assaulted him; that he was struck over the eye, cut in the face and over the forehead with a hoe; that at the time he was struck there was nothing left for him to do but to defend himself; that the cuts and blows received were of such a nature as to cause him to be sent to the Charity Hospital for treatment.

That at the time of entering this field or lot he was assaulted by Rudolph Eishman, who struck him with his fist; that the plaintiff struck him with a hoe over his eye and forehead, thereby inflicting serious wounds upon his person; that he was knocked down, beaten and stamped upon; that from the effect of said cuts, bruises and beating he had been ever since unable and was still unable to attend to the ordinary business affairs of life and to his business; that he suffered both mentally and physically; at the time of answering he was under the treatment of a physician; that from the effects of the cuts, beating and bruises he had received at the hands of the plaintiff, aided and assisted by his half brother, his sight had become impaired; that he had suffered damages to an amount of five thousand dollars. He prayed judgment for that amount and for trial by jury.

The case was tried before a jury which rendered a verdict for the plaintiff and against the defendant for the sum of ten thousand dollars and costs of court. Defendant moved for a new trial. Plaintiff entered a remittitur for five thousand dollars. The court refused a new trial and rendered a judgment against defendant in favor of plaintiff for five thousand dollars, and defendant appealed.

*Louis P. Bryant,* for Plaintiff, Appellee.

*Joseph E. Generelly, Henriques & Dunn, Clegg & Quintero,* and *Joseph O. Daspit,* for Defendant, Appellant.

The opinion of the court was delivered by

NICHOLLS, C. J. The defendant does not deny that the plaintiff was shot by him. The evidence establishes that fact, as also the fact that the wound inflicted was not only painful, but very dangerous, resulting in an aneurism, from which the plaintiff may die at any moment. The question submitted to us is practically one of fact; for, if the facts be established, there can be no question as to what the law as applicable to the facts is. There are only three witnesses as to what took place at the moment—the plaintiff and his half brother, Rudolph Eishman, and the defendant. The shooting occurred in a truck garden belonging to and cultivated by the plaintiff and Eishman, in the Third District of New Orleans. The testimony shows that plaintiff had for a number of years bought the groceries he needed

from the establishment of the defendant, who kept a small grocery, with a small bar attached, at or near the corner of Frenchman and Claiborne streets; that on the morning of the 21st of August, between 7 and 8 o'clock, Rudolph Eishman called at the grocery to make purchases for his brother; that just as he was about to leave the defendant invited him to take a drink with him, and the liquor was poured out into the glasses, but before it was drunk the defendant made a remark which displeased Eishman, and he threw the contents of his glass upon the floor and left the establishment.

Eishman testified that as he was about to drink, the defendant said that he had called two named parties negroes, and that he intended to see one of them the next day and give him a piece of his mind; that upon his replying to him "that those were bad words to use," he retorted by saying "You are a negro, too." That on witness' saying, "Don't call me that; I am no negro," defendant replied: "How do you know you are no negro?" That witness said: "I am old enough to know. I only lost my poor mother a year and half ago, and I can say she had no negro blood in her." That then it was he threw the liquor from the glass upon the floor and left.

The defendant testified that he and one of the parties whom Eishman testified he had called a negro were in the barroom when Eishman entered; that he commenced talking with this man about the other party, saying: "That work ought to be stopped," when Eishman said: "I don't see why you should make such a remark about him"; that he replied: "I made no remark about him; you are mistaken"; that Eishman said: "You called him a negro"; that he (defendant) said: "You are wrong"; that with that Eishman got somewhat angry, turned his glass of whisky on the floor and walked out, saying he would not put his foot in the house any more, and would not deal with him any more, and would not come there any more; that witness said: "I am very sorry for you; I did you nothing"; that Eishman walked out and talked a little to the other man. The person named by defendant as being present at the time of this occurrence was placed upon the stand by the defendant. He testified that he was present in the barroom, but had stepped aside to read the newspaper; that the parties had a little argument between them; how it began he did not know, but it was in regard to a difference of opinion between them on some subject which he (witness) did not fully understand; that he saw they were

getting angry; that is, Eishman got angry, and defendant was a little angry too; they had little words, and he heard defendant say that he was not going to joke with Eishman and the other party, to whom Eishman referred in his testimony as having been called a negro; that defendant did not (to witness' knowledge) call Eishman a negro; when asked what he means by saying "not to his knowledge, exactly," witness said: "He did not remember. He never heard defendant use that word to Eishman—as a negro"; that defendant had not called him (witness) a negro.

Whatever may have been the words used on the occasion, there is no doubt that unpleasant remarks were exchanged between defendant and Eishman and that the parties parted in an unfriendly spirit.

An hour or two after this defendant entered the garden of the plaintiff, in which he and Eishman were planting seed. He had ridden there from his own establishment in a milk cart, the distance between the two places being about a mile and a half. Plaintiff testified that Eishman had not told him of what had taken place at the grocery, and he accosted defendant as he came towards him in a pleasant way, saying: "Hello, are you taking holiday?" That he said nothing, and witness said: "What is the matter, Louis?" And he answered: "I want to settle with that good-looking brother of yours." That Eishman was putting stakes down and drawing a line on the bed; that defendant went to him and said something "about a negro." Delatour spoke first. Eishman said: "If you repeat that over again—call me a negro again—you will see some trouble," and Delatour mentioned the word again, and said: "This is just as good a place as anywhere. You can take your hoe," making a motion as if to draw a pistol. Eishman stooped and rushed him to prevent his shooting; that witness ran up as quick as he could to prevent either one being killed, and there he got the load; witness said: "Stop that, for God's sake! What is the matter?" Defendant looked at him, and he (witness) said: "What did I do to you, Louis?" and during that time Eishman had rushed him and witness grabbed the pistol out of his hand; that the first shot Eishman got, and the second shot struck him, plaintiff, in the breast, near the heart; that he would not have prosecuted the man if he had done it accidentally, but he meant to do it—was looking straight at him; that after he had taken the pistol from the defendant, his little son, who was present, asked him for the pistol, asked him for it; that he gave it to him; that he took it home, and when called for by

Goothye vs. DeLatour.

the police officer it was given to him; that after he was shot Eishman asked him: "Are you shot?" and he answered: "Yes, I am shot through my heart. Let Delatour go and take care of me. I have the pistol." That Eishman said: "You are shot, too?" and witness said: "Yes, I am badly shot; let him go and let the law have its course." He said: "No. Give me the pistol and I will finish killing him." That witness refused to let him have it, saying: "No. Let the law have its course. I think he will pay for what he has done."

Eishman testified that when defendant entered the garden he heard the plaintiff say to him: "Hello, you are taking holiday"; that defendant answered: "No, not a d——d bit of it. I want to see your good-looking brother; I want to see him"; that witness then said to plaintiff: "Yes, if you knew what that man called me this morning, you would not want to see him here. He called me a negro"; that witness said: "Do you call me a negro again?" That defendant said: "Yes, I will call it to you again." Witness then said: "If you call me a negro again—" He did so, saying: "This place is as good as any damned place." Witness saw him pull his gun, and he said: "You take your hoe and help yourself." Witness stooped and caught him, and he was shot before he could throw him, and he next shot plaintiff. Witness did not have a hoe in his hand and did not stoop to pick one up; he stooped to run into the defendant. Plaintiff said: "Louis, what did you shoot me for? Did you mean to shoot me?" and defendant answered "Yes." That in the meantime he threw defendant down and plaintiff said: "I am shot through my heart"; that plaintiff had taken the pistol out of defendant's hand and witness said: "Give me the pistol and I will kill him," and plaintiff said: "No. I am shot through the heart; let the man go; let the law take its course," and witness pounded the defendant with his fist as much as he possibly could, when he saw that his brother was shot; that plaintiff did not pound him at all; that witness pounded the man for all he knew how. Witness denied that defendant was struck before he drew his pistol; witness did not see his brother when he came up or when he was shot. Defendant's version of the affair is that he held a note for $20, which plaintiff had given him for groceries; that when Eishman told him he would have no further dealings with him, he went out to plaintiff's to collect it; that on entering the garden Eishman and his brother were together, about ten feet apart. That Eishman said: "Hello, I am glad to see you. I have not spoken to my brother yet. I am glad

you came to explain." That witness said: "I don't see why you get angry. I have not done anything to get you angry." That Eishman then said to his brother: "Yes, Frank, that man called me a negro, and we just lost our mother," *and with that witness got two licks in the face with a hoe, and with that he (witness)* drew his pistol and he got a lick on the side of the neck, and with that another shot went off and Mr. Goothye hollered: "I am shot," and witness threw away his pistol, and with that they stamped him.

Defendant does not pretend to say that he went to see Eishman with the view of making explanations; he says he went there on a "business principle." He did not go with the intention of bringing on a difficulty. According to him, Goothye and Eishman had hoes in their hands when he approached them; the latter held also something else; he did not know whether it was a stick or not; he had the hoe in one hand and the stick in the other. He says he.*was first struck by Eishman with his fist and then by plaintiff* on the neck with a hoe which staggered him; that the two blows came almost at the same time; that as he was staggering from this blow, he drew his pistol and fired; that when he fired the second shot he was clinched with Eishman.

On cross-examination he said that *Eishman* first struck him *with his fist*, which did not exactly stagger him; that he then *struck him with a hoe, on the side, with a hoe;* that he fired at Eishman. Being asked whether Eishman had a hoe, he answered: "He *was stooping to pick up a hoe.*" He stated that when *plaintiff struck him* with a hoe, he was about five feet off holding the hoe by the end of the handle.

Defendant testified that he had made, the night before, an engagement with several of his friends to take a trip that morning to Milneburg by the train; that he missed the 9 o'clock train and, having missed it, rode out to Goothye's place to collect the note.

Two witnesses testified that they were upon the road near plaintiff's place. They heard two shots, and looking to where they came from saw the defendant upon the ground and Eishman pounding his face by moving a hoe up and down, holding it near the blade; they knew nothing and saw nothing before the shots were fired. There is no doubt that defendant was pretty badly beaten, but nothing indicates that he was cut by a hoe. The evidence shows that the defendant was at the mercy of the plaintiff and his brother. They had ample opportunity and means to have killed him had they been so inclined. The

testimony of the defendant and that of the two brothers are utterly irreconcilable. If defendant's version is correct, he is unfortunate in having it opposed by a preponderance of testimony given by witnesses whom the jury heard and believed in preference to himself. It is also unfortunate for him that he should have selected as the day for collecting the small note due him by the plaintiff that upon which a difficulty with Eishman had occurred, and that he should have selected as the place for collecting it that at which Eishman was at work, and that he should have gone to the place armed with a pistol. He did not stop when he reached plaintiff to present the note or speak to him of the debt, but passed on to Eishman. Plaintiff testified that his brother not having spoken to him of what occurred at the store, he was surprised when defendant passed him, as he did, that he stopped (working), dropped the hoe he had in his hand and looked after him.

It is impossible for us to reverse the verdict of the jury, supported, as it is, by the approval of the judge. It would be a purely arbitrary act on our part to attach more credibility to the testimony of the defendant than to that adduced by the plaintiff. The plaintiff is a man forty-nine years of age; a married man, with a wife and eleven children dependent on him for support. He is a hard working, industrious man rendered unable to perform physical work by the act of the plaintiff, and liable to die at any moment from the effect of the wound inflicted upon him. Both parties seem to belong to the humbler class of citizens. Neither, we imagine, is possessed of any great means. The theory upon which the case was decided placed the defendant before the court as guilty of a deliberate act of wrong, working fearful injury. We do not feel warranted in disturbing the verdict and judgment. It is hereby affirmed.

Rehearing refused.