123 So.2d 513 (1960)
Eugene SPEARS
v.
AMERICAN FIDELITY & CASUALTY COMPANY, Inc.
No. 21348.
Court of Appeal of Louisiana, Orleans.
June 20, 1960.
Rehearing Denied October 24, 1960.
Certiorari Denied December 12, 1960.
*514 Meyer Sabludowsky, New Orleans, for plaintiff and appellant.
Porteous & Johnson, New Orleans, for American Fidelity & Casualty Co., Inc., defendant and appellee.
Edward P. Jerry, New Orleans, for American Mutual Liability Insurance Co., intervenor and appellant.
Before McBRIDE, REGAN, and RIVET, JJ.
McBRIDE, Judge.
On April 23, 1958, Eugene Spears, plaintiff, was an employee of Cargo Service, Inc., and about 2:30 p. m. on said day he was involved in an accident when an iron bar, termed an angle iron, fell from the roof of the enclosed trailer-truck owned by J. B. Blankenship into which Spears was loading bananas, during the scope and course of his employment, and struck him on the head. Spears, claiming he sustained serious personal injuries, instituted this direct action against the liability insurer of Blankenship's said truck, seeking to recover damages in the amount of $113,715 on the allegation that the owner of the truck and his employees failed to keep the vehicle in a proper state of repair and in a safe condition, all in disregard of the safety, welfare and interest of all persons who worked in or near said truck.
The defendant in answer denied negligence on the part of its insured, denied plaintiff was injured as alleged, and, in the alternative, pleaded there was an assumption of risk and contributory negligence on the part of plaintiff which consisted of the fact that when the truck arrived at the wharf for the purpose of taking on a cargo of bananas, plaintiff assisted in putting the angle iron in place, and if it fell upon him it was due to his own negligence. In further factual support of the alternative defenses, the answer alleges that plaintiff was cognizant that the angle iron was not bolted in position, and he, without complaint, continued to work in the vicinity of the angle iron, and that through his own activities and the manner in which he was loading the truck, the angle iron was caused to fall upon him.
American Mutual Liability Insurance Company, the compensation insurance carrier of Cargo Service, Inc., intervened in the suit claiming that on behalf of its said insured it had paid to Spears, because of the injuries he received as a result of the fall of the angle iron, certain workmen's compensation benefits, and prayed that it have judgment against the plaintiff and the defendant for the full amount of said compensation payments made to Spears. See LSA-R.S. 23:1102, 1103.
In the court below the matter was tried by a jury which brought in a unanimous verdict in favor of the defendant against plaintiff and the intervenor dismissing their demands at their cost. Spears's motion for a new trial was denied by the trial judge for the reason "only questions of fact are involved." Ultimately judgment was rendered and signed in accordance with the jury's verdict. Both plaintiff and the intervenor have appealed.
We agree that as stated in the per curiam denying a new trial, the case must be resolved on the factual issues presented.
*515 The truck was a large one, the body thereof, which measured about 32 feet in length with a width of 7½ to 8 feet, being entirely enclosed with a substance called "Masonite," a type of plywood, the sheets of plywood constituting the roof resting upon 4-inch wide iron cross beams called "angle irons," spaced at intervals for the length of the truck. Both ends of each of the iron beams were bent to a right angle with a hole in each bent portion to accommodate a bolt being inserted through each hole and into the paneling forming the respective sides of the truck, and then a nut was screwed on the protruding end of each bolt on the outside of the truck in order to hold the irons tightly in place so as to bear the weight of the truck's roof.
The vehicle was in charge of Talley, an employee of Blankenship, who drove it from West Point, Mississippi, to New Orleans. Upon reaching Gulfport, Mississippi, Talley opened the rear door and noticed that one end of an angle iron located about in the middle of the truck had become detached from its moorings and was hanging downward to the floor. Talley's inspection was sufficient to disclose that the bolt which had held the fallen end of the iron in place had somehow been broken off and the nut was missing. Tally replaced the iron to its former position by raising it and pushing the broken bolt into its proper hole in the side paneling, but, of course, he could not place a nut on the broken end of the bolt on the outside. Talley then continued onward to New Orleans and brought the truck to position at the Desire Street Wharf where it was to be loaded with bananas by employees of Cargo Services, Inc. Upon opening the door Talley noticed that the defective end of the angle iron had again become detached.
We now come to a sharp and irreconcilable divergence in the testimony as between Talley and Spears and the latter's chief witness, Washington, and also as between Washington and another of plaintiff's witnesses, Montalbano. Talley's testimony is to the effect that the "car boys" meaning the employees of Cargo Services, Inc., who were to perform the loading job, placed some portable steps at the rear door of the truck to facilitate ingress and egress to and from the inside of the vehicle. Talley says he asked the men, one of whom was Spears, "to help me put this little bar up" and that they did so after which he warned them "watch it, it may fall."
Talley continued by saying that no nut was placed on the defective bolt and that the wooden paneling into which the broken end was placed was "pushed in" so as to hold the iron more snugly in position. After saying "watch it, it may fall," Talley alighted and sat down behind the truck to await the completion of the loading process. He was positive that the falling of the iron upon Spears resulted solely from the fact that Spears and his co-worker (Washington) threw bunches of bananas against the sides of the truck which, forcing the paneling outwardly, caused the disengagement of the broken bolt from the paneling.
Spears's foreman, Montalbano, appearing on plaintiff's behalf, stated that when a truck arrives at the wharf his men proceed to the truck and the driver instructs them how the fruit is to be placed in the truck. Significantly, Montalbano pointed out that the car boys see:
"* * * if the gratings was all right on the floor of the truck and also puts a slide in the truck to see if the truck is okay."
A reading of the testimony of Spears and Washington discloses that each denied he examined the truck on arrival or that he helped replace the angle iron as Talley stated, and furthermore each denied he even spoke with Talley, but these statements emanating from them, in the light of the inconsistencies therein, are unconvincing *516 and could hardly be accorded any probative force. In the first place Washington contradicts his foreman's testimony to the effect that the car boys receive loading instructions from the drivers for he made the assertion:
"* * * the foreman finds out from the truck driver and tells us how."
As between themselves Spears and Washington accomplished the complete destruction of each other's veracity. It is obvious that events and circumstances immediately preceding and at the time of the commencement of the loading of the truck are focal points in the case in view of what Talley stated with reference to the assistance Spears and Washington rendered him in connection with the angle iron, and the importance of the testimony given by these two men cannot be underestimated.
When asked at what time and the circumstances under which he met Spears that morning Washington's testimony runs thus:
"Q. What time did you usually start working? A. About eight o'clock.
"Q. What time did you meet Spears that morning? A. Well, I met him I would say about five minutes to eight, there is the bell sounds first, five minutes before we go, in other words, gives you time to get there.
"Q. Where was Spears when you first met him? A. At the bottom of the truck, standing at the step when I first walked there that morning.
"Q. Both you and Spears entered the truck at the same time? A. We both entered the truck, yes."
But according to Spears's testimony Washington was already at the truck, had received loading directions from Talley, and also had actually started "working" when he arrived upon the scene. To quote Spears's testimony in that regard:
"Q. Now, let me ask you this: When this truck came up there, you saw the driver and his helper? A. No, sir, I didn't because I don't remember seeing anyone around there when I came up there, when I came up there even the man that worked with me (Washington), He was working. I was not even there when the truck was started. I never even seen the driver or the helper or anything.
"Q. Didn't you go in that truck before any bananas were loaded at all and take a look at that truck? You went in that truck before any bananas were loaded in it, didn't you? A. Went in there?
"Q. Yes. A. I went in there to start loading, that is when I went in, to start loading it.
"Q. Didn't you walk in it before you started loading to see if the truck was clean? To see if the truck was all right? A. The truck was all ready for me to go to work, it was all ready.
"Q. You heard Mr. Vincent (Montalbano) say that you had gone in the truck to take a look to see if everything was all right? Did you do that? A. I walked up to the truck and everything was ready for me to go to work.
"Q. Did you have any conversation did you have any conversation with the driver of the truck? A. No, sir, because my partner (Washington) had done all of that when I walked up.
"Q. Didn't you have a conversation with the helper, the colored man here on the truck? A. No, sir, I did not."
We could go along and point out other discrepancies in Spears's testimony when *517 compared with the statements of other of his witnesses, but we think that no useful purpose would be served thereby. We feel we have mentioned enough to demonstrate glaring inconsistencies which disclose the weakness of plaintiff's case.
Suffice it to say that the jury, after hearing all of the testimony and observing the witnesses on the stand, resolved the factual issues, including negligence vel non on Spears's part, in favor of the defendant, which is to say they attached more credence to Talley's evidence than to that of the plaintiff and Washington, else the verdict brought in could never have been reached.
In Roux v. Attardo, La.App., 93 So.2d 332, 335, this court in considering conflicting testimony adduced at a jury trial made the observation:
"Great weight attaches to the findings of fact by a jury as well as by a trial judge and to their ability to judge the credibility of witnesses where there is sharp conflict in testimony, and in the absence of clear and manifest error the appellate court will not reverse the judgment on the question of defendant's liability. Nixon v. New Orleans Ry. & Light Co., 121 La. 447, 46 So. 568; Goothye v. DeLatour, 108 La. 286, 32 So. 391; Moore v. Blanchard, La.App., 35 So.2d 667; Tillman v. Cangelosi, La.App., 40 So.2d 523."
See, also, Hardie v. Allen, La.App., 50 So.2d 74.
Not only do we perceive no manifest error in the factual findings, but we heartily agree with the jury that Talley's testimony is the more worthy of belief, and we cannot escape the conclusion that plaintiff did help Talley replace the fallen end of the iron, that he possessed knowledge of its insecure position and the dangerous potentialities of the situation, and moreover that he was forewarned by Talley that the iron could fall. Yet Spears, a man 53 years old, continued working within the truck.
It is true Spears was lawfully upon the truck and as an invitee was entitled to have due care taken against injuring him, but he was entirely familiar with the situation and by continuing to work in an area of danger he was careless and negligent and contributed to his own injury, and because of this, in view of the alternative pleas, he cannot recover damages against defendant for it.
What we have concluded is very well expressed in the case of Moffet v. Koch, 106 La. 371, 31 So. 40. Although a claim by an employee concerned the court in that case and notwithstanding the relationship of employer-employee does not exist in the instant case, we think that the principle which confronts us is analogous to that in the cited case. The Supreme Court, quoting from Kohn v. McNulta, 147 U.S. 238, 13 S.Ct. 298, 37 L.Ed. 150, spoke with reference to the obligation of a normal mature person to see and appreciate dangers which were obvious saying:
"Where an employe is not placed by an employer in a position of undisclosed danger, but is a mature man, doing the ordinary work which he was engaged to do, and whose risks are obvious to anyone, he assumes the risks of the employment, and no negligence can be imputed to an employer for an accident to him therefrom." (106 La. 371, 31 So. 44.)
See, also, Munson v. Mistretta, La.App., 29 So.2d 402; Kohn v. McNulta, supra; Antoine v. Consolidated-Vultee Aircraft Corporation, La.App., 33 So.2d 435; Regenbogen v. Southern Shipwrecking Corporation, La.App., 41 So.2d 110.
There is an abundance of jurisprudence plainly to the effect that when a person exposes himself to a known danger he *518 assumes the risk and is guilty of contributory negligence if injured. See, New Louisiana Digest, Master and Servant.
We can find no error of any type in the judgment appealed from; therefore, it is affirmed.
Affirmed.
JANVIER, J., absent, takes no part.