(52 South. 214.)

No. 17,726.

LEE v. POWELL BROS. & SANDERS CO., Limited, et al.

(April 11, 1910.)

*(Syllabus by Editorial Staff.)*

1. APPEAL AND ERROR (§ 1098*) — REVIEW — SUBSEQUENT APPEAL—RES JUDICATA—PERSONS CONCLUDED.

The judgment on the first appeal of a cause is not res judicata on a subsequent appeal as to one not a party to the first appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. § 4369; Dec. Dig. § 1098.*]

2. MASTER AND SERVANT (§ 129*)—INJURY TO SERVANT—NEGLIGENCE—PROXIMATE CAUSE.

Where, in an action for injuries to an employé in a sawmill, struck by a log carriage suddenly caused to move, the circumstances showed that the steam was let into the engine moving the carriage, by the lever having been moved, and that the lever moved because the sawyer failed to lock it or locked it imperfectly, the juridical cause of the injury was the negligence of the sawyer and the chain of causation need not be followed beyond that negligent act, unless there was an intervening voluntary act of some person, responsible for his act, but the mere unintentional or accidental act of a third person would not break the chain of causation.

[Ed. Note.—For other cases, see Master and Servant, Dec. Dig. § 129.*]

3. NEGLIGENCE (§ 56*)—LIABILITY—INTERVENING VOLUNTARY ACT.

One who creates a danger which sooner or later will cause injury, is responsible for the injury resulting, for the juridical cause is the creation of the danger, unless an intervening voluntary act of some person responsible for his act is shown.

[Ed. Note.—For other cases, see Negligence, Cent. Dig. §§ 69, 70; Dec. Dig. § 56.*]

4. MASTER AND SERVANT (§ 245*)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

A servant is relieved of the imputation of contributory negligence from obeying an order of his master or the foreman which exposes him to danger unless the risk is so great or the danger so obvious that no prudent person would undertake it even though ordered to do so by his master.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 778–788; Dec. Dig. § 245.*]

5. MASTER AND SERVANT (§ 245*)—INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Where, in an action for injuries to an employé in a sawmill, struck by a log carriage, suddenly caused to move, because of the negligence of the sawyer, the evidence showed that several times, every day, workmen under precisely similar conditions stood in the place where the employé stood, and that the employé occupied the position he did pursuant to the express orders of the foreman, and that no duty devolved on the employé to see that the carriage would not be moved, but that such duty devolved on the foreman, the employé was not guilty of contributory negligence.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 778–788; Dec. Dig. § 245.*]

6. DAMAGES (§ 132*)—PERSONAL INJURIES—EXCESSIVE DAMAGES.

A servant in a sawmill was run over by a log carriage. His hand was badly torn, his right leg was so injured that it was amputated above the knee, his left leg was broken, and there was little or no hope of that ever being of any service to him, on the ground that the bones would not knit. The bones in both thighs were badly torn. *Held,* that a verdict for $15,000 was not excessive.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 178, 327–385; Dec. Dig. § 132.*]

Appeal from Twelfth Judicial District Court, Parish of Vernon; J. B. Lee, Judge.

Action by Nathaniel E. Lee against the Powell Bros. & Sanders Company, Limited, and others. From a judgment for plaintiff, defendants appeal. Affirmed.

See, also, 122 La. 639, 48 South. 134.

D. M. Sholars and James R. Monk, for appellant T. C. Wingate. McCoy, Moss & Knox and J. Zach Spearing, for appellants Powell Bros. & Sanders Company, Limited. E. W. Sutherlin and T. C. Barret, for appellee W. B. Williamson.

PROVOSTY, J. Plaintiff, 41 years old, had charge, as engineer, of the engine room of the sawmill of the defendant company. The engine room is on the ground floor, below the main floor, on which are the saw and other machinery. The mandrel of the saw having gotten out of order, the small whistle was blown for the engineer to stop his engine, and the large whistle was blown for the mill to shut down for the day. The foreman thought of sending the mandrel to the neighboring town by a train then short-

ly due. He went downstairs into the engine room, and directed the plaintiff to come upstairs with him and remove the mandrel for shipment. Plaintiff took up the necessary tools and followed. It was no part of his regular work; which was confined to the engine room. To remove the mandrel he had to stand between the two rails along which runs the heavy car by which the log is held and carried to and from the saw. This log carriage is operated by twin engines, one of which serves for its forward movement, and the other for its backward movement. The log carriage is of the type known as "gunshot," because of the suddenness with which it starts, and the rapidity with which it moves when a full head of steam is turned on. It starts gradually and moves slowly when the steam is fed gradually to the engines. The valve which controls the steam is itself controlled by a lever in the hands of the sawyer. This lever stands out of the floor a few feet from the saw, and is four feet high, and consists of a flat steel bar about half an inch thick and two inches broad, with a wooden handle at the top, and moves back and forth through a slot in the floor. To cut off steam altogether, the lever is put at neutral, and it can be locked there; and all movement on its part, and on the part of the engines and of the log carriage, be made impossible by means of a steel flap hinged to the side of the slot through which the shank of the lever moves back and forth. The locking with this flap is done by lifting the flap with the hand and putting it in position; and the unlocking by lifting it in the same manner and throwing it back. This flap, when entirely, or properly, on, cannot possibly come off, without being lifted off; for it lies horizontally and therefore is held in position by its own weight; and, furthermore, it fits snug on three sides of the shank of the lever. The plaintiff was standing on the track of the log carriage, where, as already stated, he had to stand for doing the work which the foreman had brought him there to do, and was stooping over the saw, with the foreman at his side, when steam got into the engine in some way, and the car started. It started so suddenly and moved so swiftly that before any one could have cried, "Lookout!" it had passed over both men, knocked away the bump posts and shot out of the mill; and, in its course, had flung the foreman to one side, and dragged plaintiff out of the mill. Plaintiff describes his injuries, as follows:

"It knocked me down and I don't know anything else about it, I don't know when it hit me. Q. What injury was inflicted upon you? A. It broke both my legs and crushed them. My hand was badly torn up all over, you might say. My head was also crushed, and the scalp bruised. It was probably two weeks before I knew how bad I was hurt. I never knew anything when they amputated my leg. Q. Your right leg has been amputated? A. Yes, sir. Q. And what injury was done to your hand? A. The flesh on my right forefinger was cut off from the bone. My finger was drawn back and the flesh between my thumb and forefinger was torn. My cheek bone was also bruised, and the bones in both thighs were badly torn up above the break in my leg. Q. Where was the break in your leg? A. In the left leg it was about seven inches above the knee, say. You might say it is half way between my knee and hip joint. Q. And the right leg was amputated just above the knee? A. Yes, sir. Q. Can you walk at all now? A. No, sir; I can't bear any weight on my leg at all."

At the date of the trial—two years and one month after the injury—plaintiff was still unable to go about otherwise than in a wheel chair; and the evidence shows that there is little or no hope of his remaining leg ever being of any service to him. It seems the bones will not knit. By a first operation the ends were tied together with catgut. About a year later, the bones not having knit, the ends were sawed off for getting a fresh surface, and the two surfaces tied together with wire; with no better success. The wire has had to be removed. A third or fourth operation might prove successful, but the chance is but slender; and,

if it should fail, the leg would have to be amputated. Every movement of the limb, or even touching it, causes pain.

Plaintiff sues for $20,000 damages. The jury awarded $15,000.

The present appeal is the second in the case. Plaintiff pleads the judgment on the first appeal as res judicata.

Clearly there is no res judicata, since the defendant company was not a party to the first appeal. See the case reported in 122 La. 639, 48 South. 134.

The negligence charged is in the failure of the sawyer to lock the lever, or to lock it properly, and in the imprudence of the foreman of the mill in exposing plaintiff to the danger.

The defenses are that no one can account for the steam getting into the twin engine, and that no presumption of negligence arises from the bare fact itself, because the doctrine of res ipsa loquitur does not apply as between master and servant. And, secondly, that until the steam was shut off entirely at the boilers the track of this car was notoriously a most dangerous place, and that by going upon it without having first shut off the steam at the boilers plaintiff was guilty of contributory negligence.

There is no occasion in this case for having recourse to the doctrine of res ipsa loquitur. The circumstances leave no room for any reasonable doubt that the steam was let into the engine by the lever having moved, and that the lever moved because the sawyer failed to lock it, or locked it imperfectly. True, no one saw this; but no other way is conceivable how the steam could have gotten into the engine. Leakage of the valve is suggested; but had the engine been fed by leakage it would have moved slowly, and the movement of the log carriage would have been correspondingly slow, whereas the car started and moved as under a full head of steam. Moreover the valve would thereaft-

er have been found defective, which was not the case. It is further suggested that the valve may have been turned by some shock or disturbance, such as might have resulted from the breaking of a sill or the sinking of the foundation; but as no shock or disturbance of that kind is shown to have occurred, there is not much use of wasting time on that theory. The sawyer had left for parts unknown (with another man's wife) by the time of the trial, and hence did not testify.

The leaving of the lever unlocked would have been so grossly imprudent that it is almost inconceivable that the sawyer should have done it, and the probability is that he went through the movements of putting on the flap, or lock, and thought he had done so, but that he put it on imperfectly; and this is all the more probable from the fact that sawdust had accumulated around there, which may have interfered with the perfect adjustment of the flap, or lock.

What caused the lever to move, after having been left unlocked or insecurely locked, no one knows. The probability is that some one of the workmen, of whom there were several around, clearing away the sawdust and débris, may have inadvertently brushed against, or struck it; or possibly thrown sawdust against it. Indeed, it was so easy to move that for all we know it may have moved by gravity, if left slightly out of perpendicular. What caused it to move is immaterial. The chain of causation by which responsibility is to be fastened upon the defendant company need not be followed beyond the negligence of leaving it in a condition in which it might move at any time from a thousand accidental causes, or perhaps of its own weight, so that its movement might be expected at any moment. So much so, indeed, that we dare say not one of the workmen knowing it to be in that condition would have been willing to venture to stand upon the track, but would have

considered that it was as much as his life was worth to do so. One who creates a danger which thus, as it were, hangs by a thread, and may at any time fall, which is bound sooner or later to fall, is responsible for the consequences of its fall. The efficient or juridical cause of the injury in such a case is the creation of this danger.

For severing the legal connection between the negligence by which such an imminent danger was created and the injury that has resulted from it the intervening voluntary act of some person responsible for his acts would have to be shown. For instance, in the present case, that some one of the workmen, noticing that the lever was unlocked, or insecurely locked, had maliciously pushed it. Nothing of that kind is shown, or even suggested. The mere unintentional, or accidental, act of a third person would not suffice for breaking the chain of causation:

"Nor when a negligence subsequent to that of the defendant is the agent by which the defendant's negligence proves injurious can the subsequent negligence be a bar to the plaintiff's recovery if such subsequent negligence was likely, in the usual and natural order of things, to follow from the defendant's negligence." Wharton, Negligence (2d Ed.) par. 145.

But whether the lever was left unlocked or not, and whatever may have caused it to move—unless it should have been the malicious, voluntary act of some person responsible for his acts (and that theory, we repeat, is not suggested)—the defendant company is responsible; for, if we assume that the breaking away of the log carriage was purely accidental (no one responsible for it), the imprudence of going upon the track without having first cut off the steam at the boilers then becomes the proximate or juridical cause of the injury, and for that cause the defendant company is responsible. There can be no question as to the imprudence, or negligence, of the act. Indeed, defendant contends that the danger was so great and evident that plaintiff should not

have exposed himself to it even by order of the foreman. Such being the case, the only question must be as to whether the responsibility for having incurred it rests upon plaintiff or upon the foreman, and, through the foreman, for whose acts the defendant company is responsible, upon the defendant company. The rule in such cases is that the servant is relieved of the imputation of contributory negligence for obeying an order of his master, or of his master's representative, which exposes him to danger, "unless the risk is so great, or the danger so obvious or glaring that no prudent person, in a like situation, would undertake it, even when ordered to do so by his employer." Thompson, Com. Neg. (2d Ed.) § 5379. The risk was not so great, or the danger so obvious and glaring, in the present case, that no prudent person would have undertaken it when ordered to do so; for the evidence shows that several times every day, for changing the saw, the workmen of the mill, under precisely similar conditions—that is to say, without the steam having been cut off at the boilers—stand in precisely the place where plaintiff was standing.

The evidence shows conclusively that it would have been much more prudent to have seen to it that the steam was cut off at the boilers. But we think that the duty of doing so devolved upon the foreman, and not upon plaintiff. It was no part of plaintiff's duty. He had nothing to do with the boilers or around them. They were in a separate building. He was under no legal obligation to give thought to the matter. It was the foreman's part or duty. Had plaintiff thought of the matter at all, he would have been perfectly justified in assuming that the steam had been cut off, inasmuch as the signal for its being done had been given. Indeed, his reminding the foreman of the danger, and suggesting to him the advisability of making sure that the steam had been cut

off, would have smacked of a lesson to the foreman. The mandrel had to be sent off by the train then shortly due, and it was no time to be standing and considering.

The verdict is perhaps somewhat large, but we could assign no positive reason for reducing it. The injuries are of the gravest character, and are permanent; and, besides, the sufferings have been very great, and plaintiff is destined to continue to suffer.

Judgment affirmed.