The plaintiff, Lewis Regenbogen, is engaged in business in New Orleans in buying, selling, repairing and upholstering furniture. On April 24th, 1947, he sustained physical injuries on a vessel which was lying in a slip of the Industrial Canal and which belonged to the Southern Shipwrecking Corporation, and which was being demolished by it. Regenbogen had gone to the plant of the Shipwrecking corporation, at its invitation, to inspect furniture on that and other vessels in order that he might make a bid for the purchase of the said furniture. The vessel, the Steamship Hannay, was moored alongside another vessel which, in turn, was moored to the dock and, as Regenbogen attempted to pass from one vessel to the other, on a gangplank which had been laid across the adjacent rails of the two vessels, the end of the gangplank which extended over the rail of The Hannay tilted downward and he fell to the deck and sustained the injuries referred to. Alleging negligence on the part of the said shipwrecking corporation, he brought this suit against that corporation and its insurance carrier, the Indemnity Insurance Company of North America, praying for solidary judgment against them in the sum of $1,025.00.
The two defendants answered denying that there was any negligence on the part of the shipwrecking corporation and, in the alternative, pleading that the plaintiff's contributory negligence had been the cause of the accident, and that he had assumed the risk of walking upon the said gangplank, knowing that more than ordinary caution should have been exercised.
There was judgment in favor of defendants and plaintiff has appealed from the judgment dismissing his suit. *Page 111 
The record shows that on April 24th, 1947, the plaintiff and his son, Isaac Regenbogen, accepted the invitation to inspect and ultimately to bid on the furniture contained in the vessels referred to, which were in the process of being demolished by the shipwrecking corporation, and were at its plant adjacent to the Industrial Canal. The inspection party consisted of plaintiff, his son, Isaac, and Ralph Ginsberg, an employee of the shipwrecking corporation. As we have said, there were two vessels moored alongside each other along the wharf, the Steamship Madang being next to the wharf and the Steamship Hannay being tied to The Madang on the other side. There were other vessels, but the record shows clearly that these two were moored only two abreast; The Madang on the inside and The Hannay on the outside, as we have already said.
In the rail of The Madang, which was adjacent to the wharf, an opening had been cut so that persons boarding that vessel from the wharf could step through that opening to the deck, but on the other side, which was next to The Hannay, no opening had been cut in either rail. These rails were forty-two inches high and extending from one vessel to the other, across these two rails, was a gangplank constructed of two boards about eight or ten feet long, twelve inches in width and two inches thick. These two boards were secured to each other by four cross members. In other words, they were cleated together by wooden cleats which were underneath. Though the rails of the two vessels were the same height, the top of the rail of The Madang was several inches, possibly as much as a foot, higher in elevation than the rail of The Hannay, because there was being removed from The Madang oil and water and that vessel rose as it was lightened. As a result of this the gangplank inclined slightly from The Madang to The Hannay, being lower on the end which extended over the rail of The Hannay. Apparently it extended over that rail a distance of three or four feet and over the rail of The Madang a somewhat similar distance. On the deck of The Madang there were temporary steps which were movable and which were placed in order to afford access to the gangplank, which was some forty-two inches above the deck itself. On the deck of The Hannay there was no similar contrivence, but there was a box which was approximately twenty inches in height and which obviously was used as a step in ascending and descending to and from the gangplank. Because of the movement of the two vessels, because of the lightening of one of the vessels, and because of the tides and the changes in the elevation of the water in the Industrial Canal, the gangplank could not be fixed firmly on either end, but over the higher end, that is, the end that extended over the rail of The Madang, there was a large rope which to some extent held the gangplank in position.
The inspection party was proceeding from The Madang to The Hannay. Mr. Ginsberg, the employee of the shipwrecking corporation, crossed first and stepped from the gangplank to the box and then to the deck of the vessel. He was followed by plaintiff, who fell from the gangplank to the deck of The Hannay and sustained injuries on which the suit is based. Plaintiff's son, Isaac Regenbogen, was following his father. It appears from the record that the plaintiff's fall resulted from the fact that he did not step to the box as Ginsberg had done, but walked to the end of the gangplank, which extended about four feet beyond the rail of The Hannay. As he reached the end of the plank, his weight, which was two hundred and thirty-five pounds, tipped it towards that end and he fell to the deck.
Plaintiff's son testified that Ginsberg, who was conducting the inspection party, had cautioned them that all of the vessels which they were visiting were in process of demolition. Plaintiff denies this. There is a dispute as to whether Ginsberg, who had completely crossed and was descending from the gangplank on the other end, turned and offered assistance to plaintiff. Ginsberg says that he did and that plaintiff replied that he did not need any assistance as he was thoroughly familiar with ships, having been on them many times. Plaintiff denies this. Ginsberg was a brother-in-law of plaintiff's son and defendants point to this as indicating that his testimony, *Page 112 
which is detrimental to plaintiff's case, must be founded on truth. Counsel for plaintiff, on the other hand, say that it indicates that there was some reason for Ginsberg's antagonism to his brother-in-law's father and that Ginsberg's antagonistic testimony is due to that relationship.
Plaintiff contends that he was hurt because of the "trap" which resulted from the way in which the gangplank was laid across the two rails with a rope on the higher end, which would indicate that the gangplank was firmly tied down on that end.
Defendants maintain that it was necessary that that rope be not too firmly tied in order to permit the gangplank to rise and fall and to change its position with the changing positions of the vessels.
We reach the conclusion that it would not have been possible to fix the gangplank so firmly that it could not move, and we also reach the conclusion that it should have been obvious to any person that it would be dangerous to walk to the end of the gangplank as Regenbogen attempted to do. We reach these conclusions largely because the district judge seems to have been of the same opinion. In situations of this kind it is obvious that it is not possible to maintain gangplanks and walkways as safe as would be required under more normal circumstances.
The vessels were being demolished; the whole picture presented was that of a scene of wreckage and any person going on those vessels should have exercised extreme care.
Mr Regenbogen, Jr., is very positive that before they went upon the ships "Mr. Ginsberg cautioned that all of these boats were in the process of being demolished".
The record shows plainly that the box, which was on the deck of The Hannay and which made it easy to descend from the gangplank to the deck of that vessel, was plainly obvious and that Regenbogen should have seen it.
Plaintiff said that he had not had much experience on ships, but that his knowledge concerning ships was "as much as the average man knows". He also said that he well knew that this ship "was scrap" and that he knew that where a boat was tied to a dock it could be fixed more firmly than where there is danger resulting from the fact that one vessel is alongside another.
In view of all of these facts we are of the opinion that the fall of plaintiff was due to his own negligence in not descending to the box and in walking to the end of the gangplank and in causing it to tip downward on that end.
The duty which an owner of property owes to an invitee is set forth in Corpus juris, Volume 45, Verbo Negligence, in section 237, as follows: "The owner, occupant, or person in charge of premises owes to invitee thereon the duty of keeping the premises in a reasonably safe and suitable condition, so that those whom he has invited to enter upon or use his property shall not be unnecessarily or unreasonably exposed to danger, and is therefore liable for injuries received by invitees as a result of a dangerous condition of the premises. As, however, the owner or occupant is not an insurer of the safety of invitees, he is not required, at his peril, to keep the premises absolutely safe, but the measure of his duty in this respect is reasonable or ordinary care, and in determining whether such care has been exercised it is proper to consider the uses and purposes for which the property in question is primarily intended."
In section 244 also is found the following: "* * * The invitee assumes all normal or ordinary risks attendant upon the use of the premises, and the owner or occupant is under no duty to reconstruct or alter the premises so as to obviate known and obvious dangers, nor is he liable for injury to an invitee resulting from a danger which was obvious or should have been observed in the exercise of reasonable care."
The thought which we have in mind in reaching the conclusion which we have reached is well expressed in Moffet v. Koch,106 La. 371, 31 So. 40, 41. Although that case involved a claim by an employee, whereas this one does not, we think that the principle, which is involved, is identical. There, with reference to the obligation of any normal mature person to see and appreciate *Page 113 
obvious dangers, the Supreme Court said: "Where an employe is not placed by the employer in a position of undisclosed danger, but is a mature man, doing the ordinary work which he was engaged to do, and whose risks are obvious to anyone, he assumes the risks of the employment, and no negligence can be imputed to the employer for an accident to him therefrom."
See, also, Munson v. Mistretta, La. App., 29 So.2d 402; Kohn v. McNulta, 147 U.S. 238, 13 S.Ct. 298, 37 L.Ed. 150; Antoine v. Consolidated-Vultee Aircraft Corporation, La. App.,33 So.2d 435.
Consequently the judgment appealed from is affirmed at the cost of plaintiff.
Affirmed.