**LITTON v. TRAVELERS INS. CO. (GENERAL ACC. FIRE & LIFE ASSUR. CORPORATION, Limited, intervenor).**

Civ. 2391.

United States District Court
W. D. Louisiana, Lake Charles Division.
Jan. 12, 1950.

78

Tooke & Tooke, Shreveport, Louisiana, for plaintiff.

Thompson, Lawes & Cavanaugh, Lake Charles, Louisiana, and Ben C. Dawkins, Jr., Shreveport, Louisiana, for defendant.

Plauche & Plauche, Lake Charles, Louisiana, for intervenor.

PORTERIE, District Judge.

This is an action by Otis L. Litton for personal injuries. The Travelers Insurance Co., Southern Alkali Corporation's insurer, is defendant.

Southern Alkali Corporation acquired custody of a plant situated near the city of Lake Charles. formerly used for the manufacture of chemicals during the last war, and was desirous of converting that plant to the manufacture of chlorine and caustic soda. Southern Alkali Corporation engaged H. K. Ferguson Company, industrial engineers, to accomplish this conversion.

At the time of his injury, Mr. Litton was in the employ of H. K. Ferguson Company as a steam fitter, and on the premises mentioned engaged in the duties of his employment.

At the time of Mr. Litton's injury, the work of converting the plant had advanced to the point that certain sections of it had been delivered to Southern Alkali and by them placed in operation.

The gas emanating from the cells which has been denominated "Wet Gas" is of such a corrosive nature that it cannot be handled in iron or other metal containers, but must be handled in ceramic vessels in what is known as "Haveg" pipe.

Much of the brief of the counsel for plaintiff has been borrowed from verbatim; or, if not, then the language taken has been styled from the argumentative to the declarative. We checked all statements of 'fact readily, as the brief gave, in each instance, footnote reference by page to the stenographic testimony.

"It is a lung irritant * * * the effects of chlorine gas on the lung, which it affects primarily, can cause a chronic bronchitis," says a doctor, witness in the case.

It was demonstrated in Mr. Litton's own case that it would actually burn the flesh. Mr. Litton experienced burns about his mouth and nose which resulted in the formation of sores. At the trial the Court observed the residual scars about his body and hands.

Dr. Rutherford T. Johnstone, whose deposition was taken on behalf of defendant, stated:

"The pathological effect of chlorine in wet form upon the bronchial system is that it produces a chemical irritation in various degrees. It may be so mild as to cause only a few minutes discomfort, or it may produce irritation of the lungs to a point where inflammation is produced and a serous exudate results, such as in pulmonary edema."

"Where one is engaged in the manufacture and distribution of an inherently dangerous agency, he is charged with the duty of exercising the utmost degree of caution, to the end that harm may not come to others." Mays v. Southwestern Gas & Electric Co., 174 La. 368, 140 So. 826.

"If, however, common experience has demonstrated that dangers lurk in the method adopted or in the instrumentality maintained by a person, he rests under the obligation of ascertaining the peril and taking precautions to avoid injury there-

from." American Jurisprudence, Vol. 38, page 747.

The manufacturing operations are conducted in two buildings some five hundred (500') feet long and sixty (60') feet wide, parallel, and connected by an enclosed bridge, thus forming a giant "H". Inside each of these buildings are two parallel lines of manufacturing cells extending the length of the building. At the time of the accident both cell-lines in Building 305 and that line of cells in Building 304 lying nearer Building 305 had been placed in operation. Mr. Litton and a group of Ferguson employees were engaged in the work of completing and conversion of the remaining line of cells in building 304 at a point some twenty (20') feet from the aisle traversing the building crosswise at its center. The exit subsequently used by the workmen opened out of a second bridge connecting Building 304 and another building which lay on the opposite side of Building 304 from the bridge connecting Buildings 305 and 304. Entry into this third building through the second bridge was blocked by a temporary barricade and the exit used was through the side of this enclosed bridge leading down a stairway to a point on the ground between Building 304 and the third building mentioned. Underneath and traversing the length of Buildings 304 and 305 directly below each of the respective cell-lines was a "Haveg" transmission line eighteen (18") inches in diameter which functioned to conduct the "Wet Chlorine" to another area for further processing.

The gas was conducted from the manufacturing cells through a gathering-line, which passed through openings in the floor of the building, to the transmission line just mentioned. These buildings were on pilasters and there was sufficient clearance beneath the building to permit walking in an erect position, even beneath the eighteen-inch transmission lines.

The cell-line already in operation in Building 304 was designated Unit No. 3. The cell-line on which Mr. Litton and the other workmen were engaged was designated Unit No. 4. In each of the respective transmission lines running beneath the cell units there was situated a device for protection of the pipe and manufacturing equipment from excessive pressure, known as a "Water-Seal". The device consisted of a "saucer" some six (6") inches in depth filled with water, and the end of an eighteen-inch "Haveg" pipe submerged to a depth of two (2") inches, except in the instance of one cell, which was submerged to the extent of two and one-fourth (2¼") inches. This tube connected into the eighteen-inch transmission line in the manner of a "T"; that is, with the shank of the "T" representing the tube having the end submerged in the water, and the cross representing the transmission line.

Obviously, the function of releasing pressure was accomplished when the pressure inside the tube, imposed on the surface of the water, became sufficiently great to displace the weight of the two (2"). inches of water; consequently, the gas passes out the end of the eighteen-inch tube into the atmosphere.

It was from this water seal under the No. 4 cell-unit that the chlorine which attacked Mr. Litton came from.

■ We think that Mr. Litton was entitled to the legal status of not less than an "invitee" of Southern Alkali Corporation.

Southern Alkali Corporation initiated the manufacture of chlorine for its profit before the conversion was completed. Thereafter gas from lines in custody of Southern Alkali Corporation escaped and attacked Mr. Litton. Under the circumstances, Southern Alkali Corporation bears the burden of one who is the "keeper of a vicious and noxious substance" and one "engaged in the manufacture and distribution of an inherently dangerous agency".

■ Under the facts and circumstances of the instant case we hold that the doctrine of res ipsa loquitur applies. Horrell v. Gulf & Valley Cotton Oil Co., 15 La. App. 603, 131 So. 709; Dotson v. Louisiana Central Lumber Co., 144 La. 78, 80 So. 205; Lykiardopoulo v. New Orleans & C. R., Light & Power Co., 127 La. 309, 53 So. 575, Am.Cas.1912A, 976; Rose v. Stephens & Condit Transp. Co., C.C., 11 F. 438.

"The defendant in the damage suit coming under the doctrine of res ipsa loquitur must show that he did not do anything that he should not have done, that he left undone nothing he should have done and that he neglected no legal duty owed to the plaintiff. Vargas v. Blue Seal Bottling Works, 12 La.App. 652, 126 So. 707; Horrell et al. v. Gulf & Valley Cotton Oil Co., 15 La.App. 603, 131 So. 709." Watkins v. Gulf Refining Co., 206 La. 942, 20 So.2d 273.

Chlorine is a very dangerous substance; the plaintiff had legal rights on the premises; thereupon, it became incumbent upon the defendant to show that it took every reasonable and necessary precaution.

Southern Alkali Corporation has failed:

(A) To account for the sudden and abnormal increase in the lines at the time of the accident.

(B) In its obligation to furnish an adequate supply of respirators to the Ferguson workmen.

(C) To warn the Ferguson workmen properly within the premises under its operating jurisdiction.

---

(A) What was the cause of the very substantial increase in pressure as indicated by the recording aerometer dial at approximately 3:00 o'clock, November 21, 1947? This being the occasion on which the gas escaped from the transmission line through the water-seal and engulfed Mr. Litton. There is no answer in the record.

(B) We refer here only to the small respirators, used by the workmen for escape purposes while engaged in routine work.

Mr. Litton and the other workmen testified that they were led to believe by the instructions of their immediate superiors and by the action of Capt. Russell and other Southern Alkali Corporation employees that they were justified in expecting to be able to draw from the Southern Alkali Corporation's supply of respirators and gas masks; the former generally and the latter when the specific need required.

Capt. Russell, safety man of Southern Alkali Corporation at the time of the accident and at the time of the trial of this case, testified that the H. K. Ferguson employees habitually drew respirators from him; and with almost equal frequency they found that the supply was short.

Mr. Litton testified that on the day on which he was injured he attempted to draw a respirator from the Southern Alkali Corporation's warehouse, as was his custom, but none was available.

The entire procedure supports the conclusion that there was an arrangement between H. K. Ferguson and Southern Alkali Corporation to the effect that the H. K. Ferguson employees could expect to draw respirators from the Southern Alkali Corporation.

(C) While a number of the witnesses for the defendant were very vague in their recollection, Mr. H. E. Murray, Project Manager on this job, testified that there was an understanding with the Southern Alkali Corporation that in the event that gas was loosed in the area where Ferguson's workmen were engaged, particularly inside the cell area, that the "Southern Alkali people" would give warning to the Ferguson employees.

He testified as follows:

"Q. Was that understood with Southern Alkali Corporation? A. Southern Alkali people were supposed to give warning, yes, sir.

"Q. That was discussed with their representative, with the people with whom you dealt in the Southern Alkali Corporation? A. It was discussed by the Southern Alkali officials and H. K. Ferguson officials." and further:

"Q. It appeared to you and the Southern Alkali people it was a better practice to have some one in the immediate cell area clear these buildings when an outbreak occurred, than to alarm the whole neighborhood? A. That is right, yes, sir."

There is no testimony whatsoever to indicate that any effort was made by the employees of Southern Alkali Corporation, on duty in the building, to warn Mr. Litton, or the other workmen engaged in making the installation of Unit 4.

As Mr. Buckner, the lead operator in charge, testified, when he became aware that an outbreak had occurred, he dashed to see where the gas was coming from; making no effort to give a warning to the Ferguson employees in Building 304.

The failure to meet the obligation to warn the Ferguson employees was neglect on the part of the Southern Alkali Corporation's employees and constitutes a failure on the part of the defendant's assured to meet its obligation under the doctrine of res ipsa loquitur.

Accordingly, we cast the defendant under the doctrine of res ipsa loquitur, unless fault be shown on the part of Mr. Litton, to a degree and at a relative position in the chain of events that would charge him with the responsibility of providing proximate cause. No action of Litton at any time may be so interpreted.

(a) Moreover, and additionally, and as pleaded, the Southern Alkali Corporation was negligent in failing to maintain an adequate alarm system or warning signal system; or any watch or lookout for warning the employees of H. K. Ferguson Company of danger from escaping gas, and that failure was a proximate cause of the injuries sustained by Mr. Litton.

Witnesses called by the defendant testified that the question of a general warning system was discussed and the idea rejected. Nevertheless, it was testified to by numerous witnesses of the defendant that the Alkali company did maintain an automatic audible warning signal for its own employees within the cell area; and that at the present time there has been installed a siren, manually operated, to give warning to its own workmen who might be in danger.

The installation of a general warning signal and its sounding would result in the loss of time by an average of some twelve hundred (1200) employees, and they being on an hourly wage basis would result in a substantial expense to the Southern Alkali Corporation. Southern Alkali Corporation had to accept either the hazard of injury to some few of the workmen or the loss of time.

We cannot say that the Ferguson men were not entitled to a general warning system and at the same time say that the employees of Southern Alkali Corporation were entitled to a warning as they did then and do now enjoy.

And, it is not as though the matter was not directly brought to their attention, as witness the written recommendation submitted by Mr. Tracy:

"On October 20th, after we had had a serious gas break and several of the men were overcome by inhaling chlorine gas, I recommended to Mr. A. T. Murray, H. K. Ferguson job superintendent, and Mr. H. Russell, the S. A. C. Safety Engineer, the following memorandum:

"'It is my opinion that few, if any of the men would have been gassed yesterday if an adequate warning sound had been installed. After checking with the engineers, I find that the operator in the control panel can tell when there is a gas leak and how bad it will be. My recommendation is that a warning system be devised and installed so that the operator in the control panel can give the warning when there is a serious gas leak or break.' Although the Ferguson officials and myself kept after S. A. C. to do this, they would never give H. K. F. permission to do same."

Furthermore, it is evident from the testimony that had there been a timely warning, Mr. Litton and the other workmen would have had an ample opportunity to avoid engulfment.

There was a buzzer or horn warning scheme installed at the control panel which was audible in the buildings. The Southern Alkali Corporation made no effort to acquaint these workmen with the significance of this signal. The passing of this information would have required only the slightest effort. The signal sounded at a substantial interval before gas would be released; certainly at an interval of sufficient length to permit the workmen to take steps for their own safety had they been promptly warned.

Mr. Buckner, one of defendant's witnesses, testified as follows, on direct examination:

"Q. With what rapidity was the gas coming out of that seal until you got to where you could see the seal itself? A. When I saw the gas, it is just as soon as our trouble occurred. I don't think—all I have to do is go down halfway, go halfway down the steps and tell where the seal is blowing. I have seen quite a few seals blow and the velocity at which the gas leaves the seal, it would be difficult to explain."

There is a bridge between Building 304 and Building 305 and the control panel is on that bridge. When you face the control panel there is a doorway immediately behind opening to a stairway outside the enclosed bridge, which, in turn, leads to the ground. This is no doubt the stair to which Mr. Buckner was referring.

It is evident from his testimony that immediately upon the occurrence of the outbreak he dashed to the doorway in order to ascertain "where the seal was blowing".

Mr. Buckner's testimony is corroborative:

"I felt it was justified in mentioning that particular case because we were trying to determine if the seal—the fume tower was in operative condition, if it was doing the job it was designed to do."

This testimony proves that the defendant, with the slightest amount of effort and in the very shortest time, could have warned the workmen in the building.

The workmen in the area did not have the benefit of a general warning signal in order to save some pay; additionally, these workmen did not have the benefit of a signal already installed for the safety of the operating company's own men.

■ (b) The Southern Alkali Corporation did not keep and maintain its equipment and installments in a proper and safe operating condition in the two specific instances hereinafter set out. The law establishing this duty is found in the following cases: Potts v. Shreveport Belt Ry. Co., 110 La. 1, 34 So. 103, 98 Am.St.Rep. 452; Lee v. Powell Bros. & Sanders Co., 126 La. 51, 52 So. 214; Bradley v. Shreveport Gas, Electric Light & Power Co., 142 La. 49, 76 So. 230.

" 'The risk incident to dealing with fire, fire-arms, explosive or highly inflammable matters, corrosive or otherwise dangerous or noxious fluids, and (it is apprehended) poisons, is accounted by the common law among those which subject the actor to strict responsibility. Sometimes the term "consummate care" is used to describe the amount of caution required, but it is doubtful whether even this is strong enough. At least, we do not know of any English case of this kind (not falling under some recognized head of exception) where unsuccessful diligence on the defendant's part was held to exonerate him.' Pollock, The Law of Torts (13th Ed. 1929) 518. See also Clark & Lindsell, the Law of Torts (8th Ed. 1929) 91, 391-93, 403; Beven, the Responsibility at Common Law for the keeping of Animals (1909) 22 Harv.L.Rev. 465; Salmond, The Law of Torts (6th Ed. 1924) 471, 478, 257-68; Burdick, The Law of Torts (4th Ed. 1926) 538, 540, 542; C. J. Animals (1915) 87-314. 315, notes 15, 16, 17 authorities collected; 25 C.J. 183 (1921) note 30, authorities collected; 25 C.J. 193, Explosives (1921) notes 33-34." 6 Tulane Law Review 337.

(b) (1) The emergency pressure-release situated at the denoted "fume-tower" was not in proper operating condition and its failure was proximate cause of Mr. Litton's subjection to the mass of gas.

There was situated immediately adjacent to the "bridge" between Buildings 304 and 305 a brick "stack" or tower through which gas was released by an emergency mechanism in the "Haveg" line, which was vented into the atmosphere above the plant.

The mechanism was designed to function and release the gas into this tower when the pressure reached one and one-half (1½") inches of water, as compared with the two (2) column inches of water required to activate the water seals directly under the manufacturing cells.

It was shown by the testimony of the defendant's own witnesses, not only that this fume tower-release mechanism did not function on the afternoon of the accident, but that the Alkali company employees in charge of the cell area were aware that it

had not been functioning. The record is devoid of any showing that any extra precautions were taken in view of the known deficiency in the operation of the fume tower-release mechanism.

It is shown by the aerometer recording chart that the pressure went to two (2) column inches at the time of the accident, but not beyond.

The functioning of the fume tower-release mechanism was designed to and would have had a substantial effect in diminishing pressure in the lines. This being true, had the fume tower-release mechanism been functioning at the time of the accident, it is to be almost conclusively presumed that the accident would not have occurred.

(b) (2) At the time of the accident the water-seal in the Unit No. 4 system was not in proper working order, and the deficiency was a primary cause of the release of the gas to which Litton was subjected.

The defendant's witnesses testified that the No. 4 water-seal was not in proper operating condition, and what is more important that gas was released at less than the two (2") inch water pressure at which it was designed and intended to function.

Again referring to the dial at the recording aerometer, we find that the pressure at the time of the accident failed slightly of reaching two (2") inches and remained at its peak for a minimum interval of time.

We conclude that, had the water-seal been in proper working order, in accordance with its design and purpose, no gas would have been released through it at the time of the accident, or, in any event, only at the very slightest amount and nothing to compare with the large quantity released at the time of the accident.

### Last Clear Chance

Pretermitting all the above reasoning, the fault finally derives from the following circumstances.

According to Mr. Buckner, he was present in the vicinity of the control panel situated on the bridge between the two buildings at the time of the release of the gas. Mr. Buckner was the superior in charge of the operating area represented by Build-ings 304 and 305 and the equipment therein. Did Mr. Buckner give any thought whatsoever to persons who might be in Building 304? He did not. Mr. Buckner's testimony taken by item and as a whole leads to the ready conclusion that when the outbreak occurred his sole thoughts and his entire attention were directed to the scene of the incident.

Mr. Buckner had ample warning of the outbreak. He knew or should have known that Ferguson workmen were engaged in installation of equipment in Building 304. He had ample time to warn them. Had they been warned, there were sufficient exits available to permit their escape.

The employee, Buckner, had the last clear chance to avoid the injury and did not avail himself of it and Southern Alkali Corporation, the employer, is primarily at fault in the circumstances, overriding all other pleas and defenses, particularly those referring to the contributory negligence and assumption of risk on the part of Mr. Litton. See O'Connor v. Chicago, R. I. & P. Ry. Co., La.App., 40 So.2d 663.

The industrial corporation very correctly (economically) decided to use its line of expensive cells, just built, as soon as possible in the manufacture of chlorine, though the next line of cells, not completed, on which Litton was working as a plumber, was from four (4'), six (6'), and, at most, at places, eight (8') feet away. This was legally permissible to it, and, granting, for the sake of argument, that Litton assumed the risk, this is so, provided the industrial corporation was free of ordinary or gross neglect. This character of neglect which casts the corporation under the circumstances is found in Items (A), (B), and (C), and in Items (a), (b) (1 and 2), aforediscussed.

As aforestated, we find the case to be against the defendant, even admitting the plea of assumption of risk filed against Litton.

However, as an academic matter, let us inquire if the plea is legally good.

The plea is known to and applied by the Louisiana courts. Moffet v. Koch, 106 La. 371, 31 So. 40; Lorino v. New Orleans

Baseball & Amusement Co., 16 La.App. 95, 133 So. 408; Radford v. Gilbert, La. App., 12 So.2d 612; Weadock v. Eagle Indemnity Co., La.App., 15 So.2d 132; Munson v. Mistretta, La.App., 29 So.2d 402; Antoine v. Consolidated-Vultee Aircraft Corp., La.App., 33 So.2d 435.

All of the above cases involve the relation of master and servant. But the plea has been allowed when such a relation did not exist; such as in the instant case: Litton was not directly employed by the defendant corporation's assured. Dallas v. Crescent Forwarding & Transportation Co., La.App., 13 So.2d 113; Regenbogen v. Southern Shipwrecking Corporation, La. App., 41 So.2d 110.

All of the above cases are distinguishable from the instant case, especially on significant facts upon which hinges judgment.

Moffet v. Koch, supra, differs in the following features:

(1) The relationship involved was conventional in nature, i. e., that of employer-employee.

(2) As the court stated therein, " * * * by using the appliances which were at hand he could have braced the trusses in question in the same way, and without danger to himself or his fellow workmen." [106 La. 371, 31 So. 44]

Lorino v. New Orleans Baseball & Amusement Co., supra, differs as follows:

(1) It involved a relationship arising through contract.

(2) The court said [16 La.App. 95, 133 So. 409]: " * * * it would seem to be a more or less dangerous practice to fail to pay attention to the play." The plaintiff sat in the bleachers at a baseball game and, when not looking at the play, he was hit by a stray ball. This failure obviously constitutes contributory negligence. "Assumption of risk" is by definition passive in nature; on the other hand, failure to fulfill an obligation is affirmative in its nature.

Radford v. Gilbert, supra, is different, because:

(1) The parties had a direct relation by contract; one obligated himself to demolish an old building.

(2) The court said [12 So.2d 614]: "He knew that in doing this work it would be necessary to remove the slate from the old roof, and that there was a likelihood that parts of this roof would be loose and more or less dangerous in walking or working on it. Whatever hazard there was in removing the roof was a part of the contract and was a risk assumed by the plaintiff whether he was working as an independent contractor or as an employee of the defendant, and he cannot now say that he did not assume the risks, hazards and dangers which ordinarily and incidentally flowed from the removal of the roof from the old building, of which he had as much, if not a greater knowledge, than the defendant owner."

Weadock v. Eagle Indemnity Co., supra, is similar in one phase and different in several:

(1) It is similar in that it holds that the want of a warning system (though neglectful in defendant) when known to plaintiff, who persists in going ahead, is not to be held against defendant, because the plaintiff knowingly assumed the risk.

(2) It would not cover the point that Litton could not, did not, and should not be held to, know that the water-seal near and under him was out of plumb—and would vent the deadly fumes prematurely.

Munson v. Mistretta, supra, is basically a repetition of the situation in Moffet v. Koch, supra. It is clearly distinguishable in that a plasterer (25 years of experience) uses the scaffold of defendant, after easy and ready examination, even nails a part of the scaffold himself to the bannister, and then is hurt by the use; in the instant case, you have a plant covering acres of ground, made of intricate and highly technical machinery, with hundreds of possible, or probable, danger points and the man, Litton, uses nothing of the defendant's vast installation—he sits on the floor innocently to do a plumbing job—not even on a line of the chlorine-making cells that is active. Could it be legal, fair, equitable, even economically advisable to the defendant, to put on Litton's shoulders this barring burden?

Antoine v. Consolidated-Vultee Aircraft Corp., supra, differs in the following manner:

(1) The case really turns on ordinary contributory negligence of the plaintiff. The court said [33 So.2d 437]:

"While it is true that hand holes would have made the use of the ladder easier and safer, it is obvious that had he exercised the proper care, plaintiff could have held on to the uprights of the ladder and prevented himself from falling."

The court said further:

"Here plaintiff, as we have said, was an experienced man who had many times ascended and descended such ladders and many other similar structures, and he is bound to have known the danger of climbing up and down upon such a structure when it wobbled as this one did.

\*    \*    \*    \*    \*    \*

" \* \* \* we conclude that had plaintiff, with his experience, used the care and taken the precautions which were obviously necessary, the accident would not have occurred, regardless of the defects in the structure."

In the instant case, Litton could not be expected to be conversant with the workings of the vast chlorine-making plant. Surely, we should not expect that Litton had either to quit work or else have a breathing apparatus of "Haveg" composition.

We shall now differentiate the two cases where the relation between the litigants was not that of master and servant.

The case of Dallas v. Crescent Forwarding & Transportation Co., supra, differs from the instant case in the following all-important particulars:

(1) Dallas had no business on the premises; he was not even an invitee; he was of no use or benefit to the defendant.

(2) Dallas was a stacker of lumber at the river front. Naturally, he was thoroughly acquainted with the loading and unloading of cotton at the river front; he knew that it was not uncommon for a bale of compressed cotton to get loose from its handler when being lowered. He voluntarily placed himself in that dangerous position and *failed to keep a lookout for his own safety*. Dallas had his back, at the moment, to where the cotton was being handled; the court held him to be guilty of contributory negligence.

In the instant case, Litton was unacquainted with the vast and complicated machinery needed for, and used in, the manufacture of chlorine. He was on the premises of the Southern Alkali Corporation with the implied permission of the Southern Alkali Corporation and to the interest of the Southern Alkali Corporation. Southern Alkali Corporation wanted early profits; it was having its next line of chlorine-producing cells installed. In fact, it could not wait for profits to come; it had to operate the recently installed line of cells—and just a few feet from the other line being repaired. Litton maintained a lookout with all his senses; did his best to get away at the first premonitory smell of chlorine; could do nothing to prevent the escape; and, after the escape of the gas, instantly took the shortest way out. He never knew where the chlorine came from. The record shows that chlorine is colorless.

Finally, we come to the case of Regenbogen v. Southern Shipwrecking Corporation, supra. Regenbogen was in the business of buying, repairing, upholstering, and selling furniture. He went aboard a vessel in the Industrial Canal in New Orleans to inspect certain furniture; and, when crossing to another vessel on a gangplank, the plank tilted under his weight and he fell to the deck of the second vessel to his injury. The doctrine of Moffet v. Koch, supra, previously discussed, was invoked and applied. Regenbogen, though considered an invitee, was thoroughly aware of the danger of going across the gangplank. He knew the exact limitations of that danger. He was faced with a very simple situation. His own want of physical control, the lack of balance, of ability to observe accurately—practically an act of his own volition—brought about his own injury.

In the instant case, Litton was faced with the overwhelming complex machinery of

the Southern Alkali Corporation. He did not do a single thing to bring about his injury. He stepped on nothing; he used nothing; he did nothing to set in motion anything to bring about his injury; he could see nothing. He was plying his trade (plumbing) innocently. He knew nothing of the complicated machinery involved in the manufacture of chlorine gas. He came to suffer because of the neglect of the defendant's assured, whose eventual interest and object he was furthering.

We repeat, pretermitting all the points of negligence afore-discussed, the plea of assumption of risk by Litton, filed against him by the defendant, falls, because, under the jurisprudence of Louisiana, above analyzed, such assumption of risk by Litton, under the facts and circumstances of this case, is impossible.

### Damages

All the medical talent is agreed on the point that Litton is not suffering from tuberculosis—never did have tuberculosis.

We are satisfied from the evidence of the doctors and from the testimony of Litton himself, corroborated by a number of lay witnesses, that he suffered severely, is suffering yet, and that he is partially and permanently disabled.

Litton was knocked down by the density of the fumes, became unconscious, and only recovered when given first aid. On the same afternoon he went to a private hospital in Lake Charles, Louisiana, and was attended to by Dr. Barham from that day, Friday, until the following Tuesday. He then went to Orange, Texas, and thereafter to Galveston, Texas. He had fever all the time. A month later he went to the Physicians & Surgeons Hospital where he was attended to by Dr. Sanders for twenty-four (24) days. After that he came for a second stay of seven (7) or eight (8) days.

Dr. Barham says that Litton arrived at the hospital right after the accident and was " * * * was mildly cyanotic, or blue, a very apprehensive and nervous appearance."

Upon examination, Dr. Barham found:
"He had rales sign over his entire lungs. The base of his right lung was filled with fluid or was consolidated for a distance of about three fingers, or two inches to three inches which I thought was edema or fluid that had accumulated and was accumulated as a result of chlorine gas poisoning."

Dr. Sanders, in Shreveport, Louisiana, found that Litton was suffering from severe bronchial infection, with a severe cough, with a running fever of approximately one hundred four (104°) degrees.

We believe that Litton had hemorrhages of the lungs; he says so and Mrs. O. W. Davis says so.

We could quote at length from the record which is replete to show that this man suffered intensely and is suffering now and will likely suffer for the rest of his life.

Dr. Johnstone, for the defendant, crosses swords with Dr. Phillips, for the plaintiff. These two gentlemen are of equal skill and of equal reputation. We believe Dr. Phillips, when he says:

"In this particular patient, acute respiratory infection as evidenced by clinical symptoms of fever, severe cough and profuse foul sputum, would indicate very conclusively that the ectasia in the right lower lobe bronchus was the source of the hemorrhage."

In October, 1948, Mr. Litton was examined a second time by Dr. Barham and Dr. Pierson. Dr. Barham testified as follows:

"I found in October 1948 that Mr. Litton still had rales at the base of his right lung or the lower lobe of his right lung. With the x-ray plate was made a diagnosis of pneumonitis with a pleural thickening showing the evidence of damage that he had there of that lung because of the pneumonitis or chronic bronchitis, or whatever it might have been."

Dr. Barham further testified:

"I was of the opinion his experience was the result of the chlorine poisoning he had experienced."

Dr. Delaureal, testifiying in person and being presented with a number of x-ray pictures quite frankly said:

"The man obviously has a lot of irritation in his respiratory passage well in keeping with some of these findings."

Commenting on the x-ray plates, Dr. Delaureal says:

"The x-rays with the opaque medium reveal some little abnormality. * * * Certainly, the presence of that shadow on the x-ray makes us think of the possibility of some abnormality."

It developed from the x-ray pictures (where it is plainly seen) that Litton suffers from bronchiectasis. This is described by one doctor in the following language:

"The anatomical condition that exists is that irregular narrowing and widening of the bronchial tree. The term medically applied to that is ectasia which comes from the Greek word meaning "widening". Since it involves the bronchi, the term bronchiectasis is applied to it. The term bronchietasis is an anatomical description of an irregularity which is usually only demonstrable by x-ray technique."

Whether this bronchiectasis be congenital or is the result of the chlorine fumes is not so very material; if the abnormality be congenital, the irritation by the gas has not helped it.

We agree with Dr. Phillips in the following colloquy:

"Q. Are those points of such nature and condition as they would be particularly hospitable hosts for infections? A. Yes, sir, that is entirely true. In cases of bronchiectasis to a severe or moderately severe degree, we see that many times. Patients will come in with fever, raising profuse amounts of stinking sputum and after a few days there will be very little or no pus and the patient will be relatively asymptomatic."

We are confident that Litton is not a malingerer. He does not talk nor act like one. Moreover, he has tried to follow the exercises indicated by his doctors in order to improve himself. Again, he is holding a job, calling for no physical labor, at Shreveport, Louisiana, in the open air, on a lot, working for a dealer in used cars. He there earns $30 to $35 per week.

Litton as a plumber (steam pipe fitter) was earning $90 to $100 per week prior to the accident. He is now and will remain unable to pursue his former occupation. He has only a grammar-school education. He is forty-six years of age and has a life expectancy of twenty-four years. The date of his injury is November 21, 1947, and we are deciding this case in early 1950.

We make the following assessments against the defendant:

(1) Pain and suffering $5,000;

(2) Medical expenses $1,000;

(3) Loss of earnings to date of trial $3,000;

(4) Loss of future earnings $8,500; or a total of $17,500.

In the fixation of these above amounts, our mind was controlled by the prevailing rule that the plaintiff has the burden of proving his case to a *legal certainty*. The amounts allowed to the plaintiff are to that degree of certainty: They are the least that could be accorded in money to assuage his loss and injuries. Much more could be conscientiously allowed in the realm of the normally-to-be-expected; it could not, by any fancy, be less, and the chances are constant that it should be more. We have applied the rule of legal certainty.

The General Accident Fire and Life Assurance Corporation, Ltd., has filed an intervention, seeking to be paid the amount paid by it to the plaintiff, Litton, under the Workmen's Compensation Law of Louisiana, by the provisions of the policy of insurance the said intervenor had with the H. K. Ferguson Company, Litton's employer.

In the judgment to be signed such amount as paid to that date by the intervenor will be directed first paid out of the total amount allowed plaintiff hereinabove; also, the sum of four hundred seventy six ($476) dollars for the medical expenses paid by intervenor; and, also, the sum of five hundred ($500) dollars to intervenor's attorney, as attorney's fees. We believe the latter amount to be reasonable, under the circumstances, for the work of Plauche and Plauche, attorneys.

Judgment according to the above opinion will be signed upon presentation.