LANDRY, Judge.
This is an action ex delicto wherein plaintiffs, Harvey E. Kennedy and his wife, Albertha Kennedy, seek damages for personal injuries sustained by Mrs. Kennedy and medical expense incurred by Mr. Kennedy in treatment thereof as the result of an accident which befell Mrs. Kennedy on the grounds of “Cottage Plantation”, West Feliciana Parish. The accident in question occurred April 22, 1961, when Mrs. Kennedy, a member of the faculty of Gonzales High School, and Mr. Melvin Bruss, an associate faculty member, were escorting a group of elementary grade students on a tour of the aforesaid plantation which is the site of an antebellum home known as “The Cottage”, a restored mansion open to visitation by the public for a stipulated fee. As Mrs. Kennedy was traversing a swinging footbridge suspended by cables over a creek or ravine, the structure collapsed precipitating her violently to the ground several feet below causing serious injuries to her person. The trial court rejected plaintiffs’ demands and plaintiffs have appealed.
Named defendants herein are J. E. Brown and his wife, Eudora, owners of Cottage Plantation, and their liability insurer, Columbia Casualty Company, from whom recovery is sought in solido.
Appellants plead the doctrine of res ipsa loquitur and alternatively allege defendant owners and their agents and employees were negligent in failing to properly construct and maintain the footbridge, neglecting to caution guests and invitees against its use, failing to post signs warning guests of the structure’s load limitation and maintaining the bridge as an attractive nuisance.
Defendants’ answer denies any negligence on the part of the aforesaid owners or their agents and employees and alleges the accident occurred solely due to the negligence of plaintiff. In the alternative, defendants plead assumption of risk and contributory negligence on the part of appellant wife. In a third party petition defendants, in the event of their being cast, pray for judgment over against Bruss (who made arrangements for the tour), and Travelers Insurance Company, liability insurer of the school busses in which the touring students were transported from Gonzales High School to defendants’ premises.
Generally the facts and circumstances giving rise to the instant litigation are not in dispute. All material differences are hereinafter expressly noted and, excepting therefor the ensuing chronology of pertinent events preceded and attended the accident in question.
Plaintiff, Mrs. Kennedy, and her associate, Melvin Bruss, each taught a section of the eighth grade of Gonzales Pligh. *871 School. In such capacities, each desired to arrange a field trip to nearby antebellum homes and plantations as a cultural and educational project designed to enlighten and edify their respective classes. After discussing the matter, it was decided each class would make its own arrangement for transportation and the field trips would he made on the same day. Bruss volunteered to make arrangements with the homes to be visited and for this purpose went to The Cottage approximately one week prior to the accident.
The grounds of Cottage Plantation front on Highway 61 where a rather elaborate and inviting entrance consisting of an attractive gate has been erected. The home is reached by means of a private gravel road extending from the highway to the main house over a circuitous route covering .9 of a mile. In the front and rear of the main house are situated parking areas to accommodate the automobiles of visitors, the rear parking area being larger than the front was ordinarily used for the parking of busses, trailers and other large vehicles because it afforded a greater turning space. Shortly before reaching the mansion the road crosses Alexander Creek over which passage is afforded by means of a vehicle bridge. Between the creek and the house the road forks, one prong thereof being marked with a sign indicating “To the Cottage.” At the highway entrance a large sign proclaims the premises to be the Cottage, advertises that it is open to tour during the hours 9:00 A.M. to 5:30 P.M. and states the fees charged visitors. Excepting the two signs noted, a visitor encounters no other signs on the roadway between the entrance gate and the house saving only a sign at the front of the house reading “Blow your horn” which is intended to alert guides and attendants to the arrival of guests and tourists.
The suspension footbridge from which plaintiff fell spans Alexander Creek approximately ISO feet north of the aforementioned automobile bridge. Its eastern end (which is nearest the main house) is approximately 120 yards from The Cottage. There is some dispute whether the footbridge can be seen from the road at any point other than the automobile bridge because of intervening trees, vegetation and underbrush which allegedly blocks one’s view. There is also some dispute whether a well defined path led from the roadway to the footbridge near the point where the school busses are hereinafter shown to have parked and disembarked the children.
On the day Bruss visited The Cottage to arrange the tour, he was received by a negress guide, Estelle Munson, who conducted him on a curtailed “tour” to demonstrate what the children would be shown. Bruss was steadfast in the statement that on this occasion he made specific inquiry of Mrs. Munson whether the children would be permitted to cross the footbridge and she replied that they could. According to Bruss, Mrs. Munson not only gave permis-' sion for the children to cross the suspension' bridge but also suggested that after disembarking the children on the road the busses should then proceed to the rear of the main house and park. Mrs. Munson, however, contradicted Bruss in that she denied giving him permission to take the children across the footbridge. Her repeated testimony was that she did not tell Bruss he could cross the footbridge and neither did she inform him not to cross but that she told him in effect “we would take them across,” it being her intention, in keeping with management policy, to provide guides to supervise any use of the footbridge by visiting tourists.
On the day of the accident plaintiff and Bruss arrived with their classes in the school busses engaged for the trip, the vehicle occupied by Bruss being in the lead. Upon entering the grounds of Cottage Plantation, the driver proceeded along the gravel road toward the main house and upon Brass’s direction stopped the vehicle an undisclosed distance before reaching the-automobile bridge, the point where he stopped being near a path which lead from *872 the road to the footbridge. The bus occupied by plaintiff and her class stopped to the rear of the lead bus and all occupants disembarked excepting the respective drivers. Brass then led his class up the path to the western end of the footbridge and proceeded to the center of the structure at which point he stationed himself in order to supervise the crossing. In plain view near the bridge was a sign which read “Enter on bridge at own risk.” The students in Brass's class then began to cross in single and double file approximately three feet apart according to Bruss’s prior instructions. Plaintiff and her class reached the western end of the bridge after a portion of the first class had crossed or were already upon the bridge. After an undisclosed number of plaintiff’s class started across in substantially the same manner as those already upon the bridge, that is, mostly in single and double file keeping some distance apart, plaintiff decided it best that she get to the head of her students and proceeded upon the bridge passing her students as she went along. When plaintiff reached a point approximately thirty feet from the western end of the bridge, the right handrail snapped causing the bridge decking to slant sharply to that side precipitating plaintiff violently to the creek bed below. At the time of the unfortunate accident defendant’s employees were at the main house awaiting the students’ arrival, unaware of their actual presence on the grounds.
When the busses arrived at the rear parking area with no students aboard, defendant’s resident manager, Robert Wheeler, inquired as to the whereabouts of the children. Upon being advised they had disembarked to cross the footbridge, Wheeler became concerned and immediately dispatched a guide to supervise the crossing. His efforts were in vain because when the guide arrived at the bridge, the accident had already occurred.
In rejecting appellants’ demands our learned colleague below concluded the bridge collapsed because of stress due to overloading. He further found that before entering upon the bridge, plaintiff was in a position to fully evaluate its construction and appreciate the danger of crossing while the structure was overcrowded by the numerous students upon it. On this basis he held plaintiff assumed the risk of going upon the bridge under such circumstances. In addition, our esteemed colleague of the trial court held defendant owners free of negligence with respect to the manner in which the bridge was constructed and maintained.
Astute counsel for appellants assigns as error the trial court’s ruling in effect the duty of discovering reasonably foreseeable dangerous circumstances devolved equally and concurrently upon invitee and invitor alike and further holding plaintiff guilty of assumption of risk thereby relieving defendants of liability in the event of any negligence on their part with respect to the construction, operation and maintenance of the bridge.
In both oral argument and brief before this court, learned counsel for appellants concedes the bridge was safely and properly constructed. He further acknowledges the trial court was correct in finding the stucture collapsed due to stress resulting from overloading rather than from negligence in construction, maintenance or' operation by defendant owners. Counsel presently contends the sole negligence attributable to defendants was failure to post signs at each entrance of the bridge advising " guests and visitors as to the load limit or safe capacity of the bridge. Oh this premise counsel for appellants argues it was reasonably foreseeable large groups' of invitees would use the bridge which, to all appearances was soundly constructed, therefore, it was incumbent upon defendant owners to warn prospective users as to the maximum safe load the structure would accommodate. In this regard it is urged defendant bore the burden of establishing, by competent engineering authority, the bridge’s load capacity and erecting signs at each entrance advising prospective users *873 as to the load limitation of the facility. Able counsel expressly contends defendants’ failure to erect such signs was the sole proximate cause of the accident in that said alleged omission lulled invitees, including plaintiff, into a false sense of security by leading guests to believe the structure safe for use by large groups while simultaneously neglecting to warn of the maximum load carrying capability of the facility which, if exceeded, could be dangerous. In this connection it is argued that if defendants had ascertained the safe load capacity of the bridge and posted signs at each entrance advising invitees as to its weight bearing limitation, instead of the “Enter on bridge at own risk” signs which defendant erected, plaintiff and other invitees would have been fully apprised of the capabilities of the bridge and could have avoided perils incident to overloading.
Defendant, Columbia Casualty Company (sometimes hereinafter referred to simply as “Columbia”) has appealed that portion of the trial court’s decision dismissing its third party demands and, in the alternative, prays that in the event it is cast on appeal, judgment be rendered against defendant owners, Brass, United States Fidelity and Guaranty Company, Travelers Insurance Company and Columbia, in solido.
Columbia maintains the footbridge was not destined for use by visitors and did not constitute a part of the tour, therefore, plaintiff was a trespasser who wandered thereon without defendants’ permission express or implied. Defendant maintains, and the evidence shows that as a general rule tourists were not taken upon or permitted to traverse the footbridge which was destined solely as a means of affording residents of the premises ingress and egress in times of high water which overflowed Alexander Creek making access by automobile impossible because of resultant inundation or destruction of the nearby vehicular bridge spanning the stream. It is conceded, however, that upon rare occasions guests who insistently requested permission to cross the footbridge were permitted to do so but only when accompanied by guides who supervised such infrequent crossings and never permitted more than two or three persons upon the bridge at one time. Defendant further maintains it thus owed plaintiff no greater duty than not to set a trap into which plaintiff might be lured unwittingly and that, as a trespasser, plaintiff was in as good position as defendant to evaluate the danger, if any, incident to crossing the bridge in question. Defendant also contends plaintiff, whether invitee or trespasser, was given adequate warning of the condition of the bridge by means of the signs erected at each entrance thereof bearing the admonition “Enter on bridge at own risk,” which warning plaintiff chose to ignore by proceeding upon the bridge when it was already overloaded.
That plaintiff, in entering defendants’ premises under the circumstances shown, was an invitee is too apparent to admit of serious argument to the contrary. It is well settled that an invitee is one who goes on the premises of another at express or implied invitation of the owner or occupant on the business of the owner or occupant or for the mutual benefit and advantage of both invitor and invitee. Alexander v. General Accident Fire & Life Assur. Corp., La.App., 98 So.2d 730; Mercer v. Tremont & G. Ry. Co., La.App., 19 So.2d 270; 65 C.J.S Verbo Negligence, §§ 43 and 45; 38 Am.Jur., Verbo Negligence, Section 96.
The occupant or owner (invitor) owes his invitee the duty of ordinary and reasonable care which means the obligation of maintaining his premises in a condition reasonably safe for use consistent with the purpose of the invitation including the discovery of reasonably foreseeable conditions which may be dangerous and result in injury, especially where there is time for correcting the perilous condition or giving warning to the invitee of the danger. Howard v. Early Chevrolet-Pontiac-Cadillac, Inc., La.App., 150 So.2d *874 309; Ellington v. Walgreen Louisiana Company, La.App., 38 So.2d 177; Alexander v. General Accident Fire & Life Assur. Corp., supra; Terrell v. American Automobile Insurance Company, La.App., 125 So.2d 189. We acknowledge the foregoing authorities are factually dissimilar to the case at bar and therefore not necessarily controlling herein but cite them merely as authority for the general principle of law governing the obligations of the owner or occupant toward his invitees.
An invitor may not permit existence of conditions constituting a trap or expose his guest to unreasonable risks but must give the invitee adequate and timely notice and warning of latent or concealed perils known to the former but unknown to the latter. Failure of the owner or occupant to warn of such latent or hidden defects imposes liability for injuries to the invitee exercising due care under the attending circumstances. 38 Am. Jur., Verbo Negligence, Page 754, Section 96; Crittenden v. Fidelity & Cas. Co. of New York, La.App., 83 So.2d 538; Alexander v. General Accident Fire & Life Assur. Corp., La.App., 98 So.2d 730, and cases therein cited.
The owner or occupant is not the insurer of the safety of his invitees and therefore is not -obliged to protect him against the possibility of accident but rather owes the duty of exercising ordinary and- reasonable care for the safety of the invitee commensurate with the nature of the premises, the use envisioned by. the invitation to enter and the particular circumstances involved. Crittenden v. Fidelity & Cas. Co. of New York, La.App., 83 So.2d 538; Alexander v. General Accident Fire & Life Assur. Corp., La.App., 98 So.2d 730.
We will first dispose of defendant’s contention plaintiff was a trespasser in that she entered a portion of the premises not open to invitees. In this regard defendants maintain they were unaware plaintiff intended to use the footbridge which was not part of an ordinary tour and there was no, path from the road to the footbridge which might constitute an “implied invitation” for plaintiff to approach and use the suspension bridge. On these considerations defendants argue it was not foreseeable plaintiff would cross the bridge and in so doing, plaintiff trespassed upon a portion of the property not open to visitors.
The record contains conflicting evidence regarding visibility of the footbridge from the point where the busses stopped on the road and whether a path led from that point to the bridge. Brass testified the bridge was clearly visible from that point and that a well defined path led from the road to the swinging bridge. He was corroborated to some extent by defendants’ manager, Robert Wheeler, who testified a path the width of a pickup truck existed having been previously cleared to perform work in the area which necessitated getting a small truck to the footbridge. Mrs. Wheeler and Mrs. Munson, however, testified the footbridge was not visible from the road (except from the automobile bridge) because of the presence of trees, vegetation and brush. They denied a path ran from the road to the footbridge. Photographs taken shortly following the accident support the conclusion there was faint evidence of a path from the road to the bridge in question.
We believe, however, the issue of foreseeability of use in the instant case does not depend upon visibility of the bridge from the road or the presence of a path but upon the events and circumstances which transpired when Brass made arrangements for the tour. As previously shown, Bruss testified he asked and received permission to use the footbridge. Although Mrs. Munson denied giving such permission, we are inclined to accept Bruss’s version of the conversation, especially in view of his testimony that after talking with Mrs. Munson, he personally inspect *875 ed the bridge before leaving the premises, ascertained its condition to be excellent and decided to take the children across to make the tour more attractive. We believe the conclusion inescapable defendants’ said employee well knew Bruss would use the bridge and take his party across. If there were any limitation as to its use, she should have so advised him at that time. Notwithstanding the record discloses the bridge was not ordinarily included in the tour and at the time of the accident, defendants’ manager, Wheeler, was awaiting their arrival at the house unaware they were on the premises and had started crossing the footbridge, under the circumstances shown, defendant is charged with knowledge this particular group of tourists intended to use the bridge and would do so unless prohibited, restrained or forbidden to enter thereon. Moreover, there were no signs restricting invitees to the roadway and prohibiting walking through the woods on either side. In addition, an invitee reaching the footbridge was not forbidden to cross but impliedly invited to do so with caution by the presence of the sign “Enter on bridge at own risk.”
The sole remaining issue is whether defendant owners were guilty of negligence in failing to post signs apprising visitors or invitees as to the load carrying capacity of the footbridge. This crucial issue is closely coupled with defendants’ pleas of contributory negligence and assumption of risk, all of which said questions must be resolved in the light of the attending circumstances.
Appellants now concede and the record discloses beyond dispute the bridge was safely and soundly constructed.' It con-. tained no latent or hidden defects and was amply designed and built for its intended use of affording ingress and egress to resident employees in time of emergency as hereinabove shown. Primary support for the entire structure is afforded by two main cables' which parallel each other and secondarily serve as handrails for persons using the bridge. Suspended from the two main cables are numerous smaller wires or cables to which are bolted floor boards, revealed by photographs to be timbers approximately two inches by eight inches, seven feet in length, attached in such manner that they stand on edge thus forming what amounts to floor joists. On top of these floor boards or “joists” is nailed planking running parallel to the main cables thus forming a floor or decking upon which people may walk. .Beneath the floor boards are four additional cables (two near each outer edge) held in place by U-bolts affixed to the underside of each second or third floor board serving to further support and add stability to the structure. All cables are securely anchored at each end of the bridge, either by being affixed to trees, or embedded in concrete placed in the ground, or attached to some appropriate object driven into the ground. At each end of the bridge are “towers” made of large pipe welded to form a frame over which the two main cables pass and upon which they rest in order to afford sufficient elevation to keep the structure suspended at the desired height above the creek.
Dr. Louis J. Capozzoli, Jr., Consulting Civil Engineer possessing numerous degrees including that of Doctor of Science, (whose qualifications are most impressive), was called as a witness on behalf of defendant Columbia. Dr. Capozzoli testified he examined the bridge following its collapse and found it to be constructed as herein previously described. In essence he stated the bridge was constructed in a most sound manner in accordance with approved engineering principles, practices and design. After carefully examining the bridge and its numerous components, he' calculated its load carrying capacity at 4,600 pounds based on the strength of the two main- cables alone. He did not compute its load carrying capability taking into consideration the cables , beneath the floor which would increase the bearing ability of the structure although to what extent he could not say. Since the two- *876 upper cables were the bridge’s main support, he computed its strength on these only. He found the structure possessed a safety factor professionally and scientifically rated at 2.3 which, in the science of engineering means the ratio of the total load a structure can carry to the total load upon it at any time or, the times the existing load a facility can be multiplied before failure will occur, existing load meaning the dead weight of the facility itself. We understand this to mean sound engineering practice requires a structure which can safely carry a load between 2 and 2l/z times its own weight. Finding the structure in question to be capable of safely carrying 2.3 times its own weight, it fulfilled the better engineering principle and practice of designing and constructing such facilities with a safety factor between 2 and 2.S. According to Dr. Capozzoli the bridge in question was sound in every respect and failed due to stress caused by overloading. His examination of the broken cable disclosed no rusting or other evidence of defect in material, workmanship, construction, maintenance or design. He expressed the opinion that any structure intended for use by humans should indicate the limits of its bearing capacity. He further stated, however, that the science of determining weight bearing capacity is not entirely exact and that a structure scientifically designed to carry 4600 pounds might fail at 4300 pounds and on the other hand, might sustain a load of 4800 to 5000 pounds.
Plaintiff concedes that upon reaching the western end of the bridge, she waited there for a few minutes to allow a portion of Brass’s class to cross. She acknowledged seeing the sign admonishing prospective users to “Enter on bridge at own risk.” Having previously received Bruss’s assurance the bridge was safe and her own observation revealing it to be apparently sound, she concluded it prudent -to permit her class to cross. It is not seriously disputed that at the time the bridge collapsed forty-three children were on structure in addition to Bruss and plaintiff. The weight of these children approximated 4710 pounds which circumstance was ascertained by circulating mimeographed questionnaires among the two classes requesting those on the bridge at the time of failure to indicate their approximate positions on the structure together with their respective weights.
Learned counsel for plaintiffs relies upon Department of Highways v. Fogleman, 210 La. 375, 27 So.2d 155, and Department of Highways v. Jones, La.App., 35 So.2d 828, as authority for the proposition that it is negligence for the state to fail to post load capacity signs at bridges forming part of the state highway system. On the other hand, esteemed counsel for defendants distinguishes the Fogleman and Jones cases, supra, on the grounds they relate to automobile bridges on public highways whereas the case at bar involves a suspension footbridge on private property.
While we heartily approve the holdings in the Fogleman and Jones cases, supra, under the facts therein obtaining, we agree that they are factually dissimilar to the case at bar and therefore do not necessarily control the case before us.
The bridge in question was admittedly of sound construction and free of hidden or latent defects as regards its erection and maintenance. It was built in accordance with sound engineering principles and amply suited for its intended purpose of serving as an emergency means of pedestrian ingress and egress for the residents of the house. It was not designed to accommodate large groups of persons simultaneously. The posted sign “Enter on bridge at own risk” gave notice that-use of the facility was not without some attendant danger notwithstanding its ap *877 parently sound condition. Granted the sign did not warn of the load capacity, nevertheless it should have alerted an ordinarily prudent individual of the danger of entering thereon when the structure was overloaded. The bridge was approximately 100 feet in length and its center and lowest point was suspended several feet above the almost dry creek bed below. Photographs introduced in evidence readily and clearly indicate the bridge to be a rather unique structure not of a kind ordinarily encountered in the usual course of events. The clear preponderance of evidence indicates such a structure is inclined to sway to some degree even when used in an orderly manner by as few as three or four persons. Such a facility should prompt an ordinary and reasonably prudent prospective user to exercise caution before proceeding thereon. Plaintiff, a thirty year old school teacher, must be deemed to possess ordinary reason and prudence.
We find no merit in the contention a sign proclaiming the maximum load capacity of the bridge would have averted the accident in that it would have cautioned plaintiff as to just how much weight the bridge could carry. Assuming arguen-do, defendants had previously determined the capacity of the bridge and posted signs declaring its maximum capacity at 4600 pounds, we do not see wherein the accident would have been avoided. Such a sign, we believe, would tend to create the very hazard to be avoided, namely, overloading, as it could be easily construed as implied authorization to load the bridge to the indicated capacity, an act which would have been manifestly dangerous considering the circumstances shown. We believe the circumstances such that a reasonably prudent individual should have exercised extreme care in crossing, especially so when it was overloaded with children. The bridge did not constitute a trap to the unwary; plaintiff had ample opportunity to apprise the situation before setting foot on the structure. Plaintiff having elected to go upon the bridge while it was already overloaded was bound to proceed only with care and caution which she did not do. Plaintiff invitee, confronted with an obvious danger readily discernible to her, failed to exercise due care and caution for her own safety. Having elected to use the facility under extraordinary circumstances, namely, while the bridge was already overburdened, plaintiff was obliged to exercise care and caution in so doing. Being remiss in this regard, she must be deemed to have assumed the risk of such dereliction.
A host is not liable for an injury to an invitee resulting from an obvious danger or peril which should have been observed by the invitee in the exercise of reasonable care, or from a condition which was as well known or as obvious to the invitee as to the invitor. Alexander v. General Accident Fire & Life Assur. Corp., La.App., 98 So.2d 730; Crittenden v. Fidelity & Cas. Co. of New York, La.App., 83 So.2d 538; Regenbogen v. Southern Shipwrecking Corporation, La.App., 41 So.2d 110; Knight v. Travelers Ins. Co., La.App., 32 So.2d 508.
For the foregoing reasons, the judgment of the trial court is affirmed at appellants’ cost.
Affirmed.