182 So.2d 519

Harvey E. KENNEDY et ux.

v.

COLUMBIA CASUALTY COMPANY et al.

No. 47831.

Jan. 17, 1966.

Rehearing Denied Feb. 23, 1966.

David W. Robinson, of Watson, Blanche, Wilson, Posner & Thibaut, Baton Rouge, for plaintiffs-appellants.

Charles W. Franklin, of Franklin & Keogh, Baton Rouge, for defendant-appellee.

HAWTHORNE, Justice.

Mr. and Mrs. Harvey E. Kennedy brought this suit for damages resulting from injuries which Mrs. Kennedy sustained when the breaking of a steel cable supporting a suspension or swinging footbridge caused her to fall several feet to a dry creek bed below. The defendant is the Columbia Casualty Company, liability insurer of Mr. and Mrs. J. E. Brown as owners of The Cottage plantation on which the suspension bridge is

situated.[1] After trial the district court dismissed plaintiffs' suit, and the Court of Appeal, First Circuit, affirmed. 174 So.2d 869. This court granted a writ of certiorari on the application of the plaintiffs, 247 La. 1092, 176 So.2d 147.

The Cottage plantation is east of U. S. Highway 61, a few miles north of St. Francisville. On this plantation is situated an antebellum home known as The Cottage. The plantation fronts on Highway 61, and there is a large sign advertising that The Cottage is open to tours by visitors between stated hours for a stated fee. The Cottage, located approximately a mile off the highway, is reached by a winding, wooded gravel road which crosses a stream known as Alexander Creek by means of a vehicular bridge. Upon reaching the main house, The Cottage, and parking in the areas provided for that purpose, visitors are conducted on a tour which consists of a visit to the downstairs part of the main dwelling, the schoolhouse, the milk house, the smokehouse, the old kitchen, and the carriage house, and thence they are taken through the gardens back to the vehicles in which they arrived. The suspension footbridge from which Mrs. Kennedy fell was not a part of the tour.

This suspension footbridge, like the vehicular bridge, spans Alexander Creek. It is about 100 feet long and is approximately 150 feet north of the vehicular bridge. Neither the vehicular bridge nor the footbridge can be seen from The Cottage. In fact, the footbridge is visible only from the vehicular bridge to a party approaching The Cottage by the gravel road. After crossing the vehicular bridge the gravel road forks, and one prong is marked with a sign indicating "To The Cottage". In the front and rear of The Cottage, or main house, there are parking areas.

On a Sunday before the accident Melvin Bruss visited The Cottage plantation to make arrangements for a tour by eighth-grade students of the high school in which he and the plaintiff Mrs. Kennedy were teachers. On this occasion Mr. and Mrs. Robert Weller, who managed the plantation for the Browns, the owners, were away, and Bruss discussed the proposed tour with an employee, Estelle Munson. In leaving the plantation after this discussion he, accompanied only by his father, went to the suspension bridge, and both walked onto the bridge.

On the day of the accident Bruss and Mrs. Kennedy accompanied two busloads of about 60 eighth-grade students on this tour. The busses entered The Cottage plantation with Bruss's class in the lead bus, and at a point a short distance before reaching the vehicular bridge both busses stopped

1. A non-suit without prejudice was entered as to all defendants except Columbia Casualty Company. Melvin K. Bruss and others were made third party defendants by Columbia, and the demand against them was dismissed by the lower court when it dismissed plaintiffs' demand against Columbia.

on Bruss's instructions and discharged the students. After alighting from the bus he led his students through a wooded area to the west end of the suspension or swinging footbridge, which was overgrown with weeds and bushes. Mrs. Kennedy followed with her class. At this end of the bridge (as there was also at the east end) there was a sign, clearly visible, which read "Enter on Bridge at Own Risk". Bruss and his students started across this bridge, and Mrs. Kennedy and her class followed. As they were crossing the bridge, its right main cable, which also served as a handrail, broke, causing the floor of the bridge to tilt sharply to the right. As a result Mrs. Kennedy fell onto the ground below and sustained the injuries for which she seeks damages in this action. At the time the cable broke, besides Mrs. Kennedy and Bruss there were some 43 students on the suspension footbridge.

It is conclusively established that the bridge was soundly constructed, in good condition, and properly maintained, and had no hidden defects, and that the cable broke solely because of overloading. The bridge had been built for the private use of the occupants of The Cottage to serve as an emergency exit across Alexander Creek whenever the vehicular bridge was damaged or destroyed by the flooding of the creek. The vehicular bridge was subject to being damaged or destroyed by high water, and at such times tours of The Cottage were not permitted. Even when The Cottage was open to tourists, the suspension bridge did not serve as an alternative route to The Cottage or main house, and tourists had never been known to use this bridge to approach The Cottage. The route provided for tourists was by way of the gravel road which crossed the vehicular bridge and continued to the parking areas in front and rear of The Cottage. Moreover, the suspension bridge was not shown or used as a part of the tour of the premises.

According to the testimony of Mrs. Weller, there was no footpath leading to the west end of the suspension bridge from the gravel road at or near the place where Bruss stopped the busses. Counsel for plaintiffs concede there was no well used or well defined path, and there is no doubt that the route taken by the teachers and the students was one covered by brush and undergrowth. Moreover, the bridge itself, as stated previously, could not be seen from the gravel road through the trees and underbrush.

When the accident happened, Mr. and Mrs. Weller and Mrs. Brown, who had been notified that the students would soon arrive, were waiting for them at the main house, with the employees who were to guide the group on the tour. The Wellers, Mrs. Brown, and the employees were unaware that the students were already on the grounds until the busses arrived at the rear parking area of The Cottage with only the drivers. Inquiry was made as to the where-

abouts of the students, and upon being informed that they had left the busses to cross the footbridge, Mr. Weller immediately became concerned and sent a guide to assist them in the crossing; but the guide arrived at the footbridge only after the accident had happened.

After trial the district judge dismissed plaintiffs' suit because, as stated in his reasons for judgment, he found no negligence on the part of the plantation owners and employees, but he declared that if there was any negligence, Mrs. Kennedy was barred from recovery because of her own contributory negligence and because she had assumed the risk.

The Court of Appeal, which affirmed this judgment, found that the plaintiff Mrs. Kennedy upon entering The Cottage plantation under the circumstances shown was an invitee, and then set forth the duty of the occupant or owner to such an invitee as follows:

"The occupant or owner (invitor) owes his invitee the duty of ordinary and reasonable care which means the obligation of maintaining his premises in a condition reasonably safe for use consistent with the purpose of the invitation including the discovery of reasonably foreseeable conditions which may be dangerous and result in injury, especially where there is time for cor-

recting the perilous condition or giving warning to the invitee of the danger. * * * "

No contention is made by the litigants before this court that the Court of Appeal was incorrect in its conclusion that Mrs. Kennedy was an invitee or in its statement of the duty imposed by law upon the owner or occupant to an invitee.[2]

In its decision the Court of Appeal found, among other things, that the bridge was structurally sound, built in accordance with sound engineering principles, and free of hidden or latent defects, that it was not designed to accommodate large groups of persons, and that because of its construction it was inclined to sway in some degree even when used in an ordinary manner by a small number of persons; and the court concluded that the posted sign "Enter on Bridge at Own Risk" gave notice that use of the facility was not without some attendant danger, and should have alerted an ordinary prudent person of the danger of entering on the structure when it was overloaded; that "Having elected to use the facility under extraordinary circumstances, namely, while the bridge was already overburdened, plaintiff was obliged to exercise care and caution in so doing. Being remiss in this regard, she must be deemed to have assumed the risk of such dereliction".

2. In the Court of Appeal the defendant contended that Mrs. Kennedy was a trespasser because the footbridge was not destined for use by visitors and did not constitute a part of The Cottage tour.

The Court of Appeal treated the adequacy of the sign at the bridge as the only issue in regard to negligence of the owners, and found that there was no merit in the contention of the plaintiffs that a sign proclaiming the maximum load capacity of the bridge would have avoided the accident.

As we view the matter, the first question to be determined is whether the plaintiffs have established that the owners of The Cottage plantation were negligent. A negative answer to this question, of course, would end the case, and we would not reach the questions whether Mrs. Kennedy was herself negligent and whether she is barred from recovery under the assumption of risk doctrine.

In determining whether the owners were negligent the first inquiry is: Should the owners under the facts and circumstances of this case have reasonably foreseen that Bruss would unload the 60 students before reaching the vehicular bridge and take them across the suspension footbridge to reach the main dwelling, where the tour was to begin and where guides were awaiting their arrival to conduct them on the tour, so that there was imposed upon the owners the duty to take precautions as to such a crossing and see that the crossing was properly supervised and safely made?

. The district court was of the view that it was reasonably foreseeable by the owners that the students and their teachers would cross Alexander Creek on this suspension bridge, and the Court of Appeal was of the view that it was foreseeable that this group would use the bridge. We do not understand these views to be that the owners actually knew that Bruss planned to use the bridge as he did and bypass the usual route to the main house, and under the facts and circumstances of this case his action was not even reasonably foreseeable.

Inasmuch as there was some discussion of the bridge and the possibility of its use by the students on this tour when Bruss discussed the scope of the tour with Estelle Munson, the owners may reasonably be held to have foreseen that the bridge would be used and shown on the tour under the supervision of the guides employed for that purpose after the group had reached The Cottage, the designated place at which the tour was to begin. On infrequent occasions in the past when visitors had particularly requested to go onto the footbridge, they had been permitted to do so a few at the time under the supervision of the guides. We do not agree, however, that the owners could reasonably have foreseen under the facts and circumstances shown to exist in this case that Bruss would do what no other visitor had ever done before—that is, that before going to The Cottage where the tour was to begin under the supervision and control of guides furnished for this purpose he would leave the regular and well marked route to The Cottage before reaching the vehicular bridge, cause two busloads of ap-

proximately 60 children to unload on the side of the gravel road, conduct them through brush and undergrowth over a terrain where there was certainly no well defined path to the west end of the footbridge, which was also overgrown with weeds and bushes, and then proceed to lead this large group of people across the swaying suspension bridge to reach The Cottage where the tour was to commence. The owners of the premises should not be held to foresee and guard against or take precaution as to such an unprecedented and unlikely use of the premises.

The burden was on the plaintiffs to prove by facts and circumstances their allegation that the owners in this case could reasonably have foreseen that Bruss and his group would approach The Cottage to commence the tour by way of the suspension footbridge; and to establish this they rely on Bruss's testimony that he had permission or consent from the guide Estelle Munson to bring his group to The Cottage by way of this bridge. Bruss may have honestly believed that he had this permission, but the facts and circumstances as the record reveals them do not justify such a belief on his part, and the plaintiffs have not borne the burden of proving that the accident was foreseeable and should have been guarded against and prevented. Therefore no negligence on the part of the owners has been established, and the judgments of the lower courts dismissing plaintiffs' suit were proper.

For the reasons assigned the judgment of the Court of Appeal affirming the judgment of the district court which dismissed plaintiffs' suit is affirmed at plaintiffs' costs.

FOURNET, C. J., dissents and will assign written reasons.

McCALEB, J., dissents with written reasons.

SANDERS, J., dissents and will assign written reasons.

McCALEB, Justice (dissenting).

I do not subscribe to the majority holding that the owners could not reasonably have foreseen that Bruss and his group would use the 'suspension footbridge to enter the premises for the tour and that plaintiffs have failed to carry the burden of proving that Bruss had previously obtained the consent of the guide, Estelle Munson, to bring his group to The Cottage by way of this bridge.

Examination of the statements of Bruss and Estelle Munson convinces me that the testimony of the former clearly preponderates over the partial denial of the latter that the crossing of the bridge would be permitted under the direction of the tour guides. Indeed, both the district judge and the Court of Appeal experienced no difficulty in resolving that plaintiffs had

established that it was foreseeable by the owners of The Cottage that the school group would use the suspension footbridge. The facts on this issue, as determined by the Court of Appeal (with which determination I fully agree) are as follows:

"The record contains conflicting evidence regarding visibility of the footbridge from the point where the busses stopped on the road and whether a path led from that point to the bridge. Bruss testified the bridge was clearly visible from that point and that a well defined path led from the road to the swinging bridge. He was corroborated to some extent by defendants' manager, Robert Wheeler, who testified a path the width of a pickup truck existed having been previously cleared to perform work in the area which necessitated getting a small truck to the footbridge. Mrs. Wheeler and Mrs. Munson, however, testified the footbridge was not visible from the road (except from the automobile bridge) because of the presence of trees, vegetation and brush. They denied a path ran from the road to the footbridge. Photographs taken shortly following the accident support the conclusion there was faint evidence of a path from the road to the bridge in question.

"We believe, however, the issue of foreseeability of use in the instant case does not depend upon visibility of the bridge from the road or the presence of a path but upon the events and circumstances which transpired when Bruss made arrangements for the tour. As previously shown, Bruss testified he asked and received permission to use the footbridge. Although Mrs. Munson denied giving such permission, we are inclined to accept Bruss's version of the conversation, especially in view of his testimony that after talking with Mrs. Munson, he personally inspected the bridge before leaving the premises, ascertained its condition to be excellent and decided to take the children across to make the tour more attractive. We believe the conclusion inescapable defendants' said employee well knew Bruss would use the bridge and take his party across. If there were any limitation as to its use, she should have so advised him at that time. Notwithstanding the record discloses the bridge was not ordinarily included in the tour and at the time of the accident, defendants' manager, Wheeler, was awaiting their arrival at the house unaware they were on the premises and had started crossing the footbridge, under the circumstances shown, defendant is charged with knowledge this particular group of tourists intended to use the bridge and would do so unless prohibited, re-

strained or forbidden to enter thereon. Moreover, there were no signs restricting invitees to the roadway and prohibiting walking through the woods on either side. In addition, an invitee reaching the footbridge was not forbidden to cross but impliedly invited to do so with caution by the presence of the sign 'Enter on bridge at own risk.' "

See 174 So.2d at pages 874 and 875.

It is almost inconceivable to me that Bruss, the teacher who had made advance arrangements for the visitation by the eighth-grade pupils to this anti-bellum home, would have planned and directed the approach and entrance to the premises by his party of 60 persons via the suspension footbridge had he not had the specific permission of the guide, Estelle Munson, with whom he had made contact on his prior visit. And, of course, since Estelle Munson represented the owners of The Cottage, they are bound by her act made within the apparent scope of her authority.

That the owners of The Cottage were guilty of negligence in failing to provide reasonably safe premises for their paying patrons, I have not the slightest doubt. It just will not do, in my opinion, for the defense to say that the footbridge, which, in itself, must have been one of the attractive features of the premises, was soundly constructed and thereby escape liability for its collapse. For the civil engineer, Dr. Capozzoli, testifying for the defense that the cause of the collapse of the bridge was due to overloading, expressed the opinion that any structure like a footbridge, which is intended for use by "humans", should indicate the limits of its bearing capacity. Accordingly, since the owners could and should have foreseen that the bridge might be used by large groups of patrons, it was their duty to protect such patrons from harm—either by disallowing the use of the bridge when the patrons were unattended by a guide, or by posting warnings on the bridge indicating the load limit capacity of the structure.

To deduce, as the Court of Appeal did, that the posting of signs declaring the maximum capacity of the bridge to be 4,600 pounds would not have avoided the accident in this case, is dealing in pure speculation. At any rate, such a sign would have been an effective legal warning which may have warranted the dismissal of plaintiff's suit under the doctrine of assumption of risk.

The Court of Appeal, I think, clearly erred in holding assumption of risk applicable here as it is unrealistic to say that plaintiff had any reason to suppose—unless advised by the owners—that the load capacity of the bridge, over which 43 children had already crossed or were crossing, was incapable of supporting her added individual weight. What the Court

of Appeal was really saying was that plaintiff was contributorily negligent in traversing the bridge under the visible circumstances. But I have difficulty in following this ruling as it cannot be fairly said that Mrs. Kennedy should have known that the bridge was overloaded.

The sign "Enter on bridge at own risk" did not provide notice that the bridge was dangerous. Indeed, the owners assert and the courts have held that the structure was sound within certain load limits. Therefore, the sign posted can only be regarded as an invitation to the patrons to use the bridge coupled, however, with the proviso that when they do so, it is at their own risk. This proviso is, of course, simply an attempt by the owners to stipulate against their own liability for negligence which, in view of the relation of the parties, is contrary to public policy and unenforceable.

I respectfully dissent.

FOURNET, Chief Justice (concurring in part and dissenting in part).

I fully agree with the majority that (1) the plaintiff Mrs. Harvey E. Kennedy was, at the time of her injury, an invitee of the owners of The Cottage plantation and that these owners were not the insurer of her safety on that occasion, owing her only the duty of exercising ordinary and reasonable care for her safety commensurate with the nature of the premises and the use envisioned by the invitation to enter, and (2) that failure of the owners or occupants to adequately and timely warn the invitee of latent or concealed peril of which they have knowledge imposes liability upon them. However, I cannot agree with the majority that under the facts and circumstances of this case the owners could not reasonably have foreseen that Bruss and his group (including the plaintiff) would use the suspension footbridge.

The record unmistakably shows, as found by both the trial judge and the Court of Appeal, that Bruss, in making the arrangements for the tour with Estelle Munson, employed by the defendant owners for that purpose in their absence, secured her permission to cross the footbridge. It is hornbook law that knowledge of the agent is imputed to the principal. Consequently, plaintiff, as a paying customer of the defendants, "had a right to assume that the premises into which she was invited were safe and was not charged with any legal duty of looking out for lurking or hidden dangers." Cassanova v. Paramount-Richards Theatres, 204 La. 813, 16 So.2d 444, and the authorities therein cited. If there were any limitations as to the use of this bridge, it was incumbent upon the employee to have so advised Bruss.

The fact that there was a sign on the bridge "Enter at Your Own Risk" does not detract from the duties imposed upon the owners to inform the user by timely

and proper notice of its limitations, which, in this case, was as to capacity. To hold otherwise would be to permit an owner to relieve himself of liability for injuries caused by their own acts of negligence, commission, or omission, which is contrary to our public policy.

SANDERS, Justice (dissenting).

Mrs. Alberta T. Kennedy, a school teacher, sustained injuries on the grounds of The Cottage when a footbridge fell, as she and her class crossed it. The Cottage is an antebellum home, open to the public for tours, and Mrs. Kennedy was conducting her class on the tour. The collapse of the bridge was caused by a break of a steel-supporting cable. Mrs. Kennedy and her husband have sued to recover damages.

The basic law governing the demand is found in three articles of the Louisiana Civil Code:

"Art. 2315. Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it. * * *"

"Art. 2316. Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill."

"Art. 2322. The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."

Article 2322 makes the owner answerable for damage caused by the fall of a building, whether it falls because of a neglect to repair it or a vice in the original construction.

As used in this article, the term, "building," refers to a construction. The jurisprudence establishes that the term includes bridges constructed upon privately owned land. Baucum v. Pine Woods Lumber Co., 130 La. 39, 57 So. 577; Lawson v. Shreveport Waterworks Co., 111 La. 73, 35 So. 390; 39 Tulane Law Review, 798, 837. See also Atkins v. Bush, 141 La. 180, 74 So. 897, L.R.A.1917E, 809; Allain v. Frigola, 140 La. 982, 74 So. 404; and Cristadoro v. Von Behren's Heirs, 119 La. 1025, 44 So. 852, 17 L.R.A.,N.S., 1161.

The difficult question under this Article is whether the use of a steel cable of insufficient size and strength to support the number of people the footbridge would spatially accommodate is a vice of original construction. The Louisiana jurisprudence on this question is quite meager. Two decisions have suggested in dicta that this Article excludes only a fall, or collapse, caused by a *vis major* or fortuitous event. Thompson v. Commercial Nat. Bank, 156 La. 479, 100 So. 688; Barnes v. Beirne,

38 La.Ann. 280; 4 Tulane Law Review 611, 615.

Pending further research, I reserve judgment on the question. The applicability of Article 2322, however, is squarely presented by the facts and should be determined by the Court.

Presently omitting further consideration of Article 2322, I am of the opinion that Articles 2315 and 2316 require the imposition of liability on the defendant. The plaintiff was an invitee. As both courts below found, it was foreseeable that the school group would use the bridge. Under the circumstances, the owners were under a duty to close the bridge or, *at least,* to post a warning to indicate the safe limit of the load capacity.

The sign "Enter on Bridge at own risk" does not suffice as a warning of the load capacity. At best, it is a unilateral attempt to stipulate against liability for accidents on or about the bridge by invitees using it. Such a stipulation, of course, is contrary to public policy and unenforceable. See Gilliam v. Lumbermens Mutual Cas. Co., 240 La. 697, 124 So.2d 913 and Klein v. Young, 163 La. 59, 111 So. 495.

Since the record is insufficient to establish either contributory negligence or assumption of risk, the plaintiffs should recover.

For the reasons assigned, I respectfully dissent.